**AEROPLATE CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 05–736C.**

United States Court of Federal Claims.

Aug. 5, 2005.

William L. Bruckner, San Diego, CA, for plaintiff.

William G. Kanellis, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Major Timothy Ryan, Office of the Chief Counsel, National Guard Bureau, of counsel.

## *OPINION*

CHRISTINE O.C. MILLER, Judge.

Before the court after argument are the parties' cross-motions for judgment on the administrative record in this post-award bid protest. Plaintiff challenges the contracting official's ability to reject a bid as nonresponsive based upon knowledge that the apparent low bidder, which submitted a facially valid bid bond, will not be able to secure the performance and payment bonds from the original surety post award. By order dated July 15, 2005, the court granted plaintiff's request for interim injunctive relief pending this ruling. *Aeroplate Corp. v. United States*, No. 05–736C, 2005 WL 1840044, 67 Fed.Cl. 1 (Fed.Cl. July 15, 2005) (order granting preliminary injunction). The court addresses the merits of the parties' contentions in light of the administrative record before the court and supplements to the record filed pursuant to RCFC 56.1.

## FACTUAL AND PROCEDURAL BACKGROUND [1]

On April 26, 2005, the U.S. Property and Fiscal Officer for California issued Solicitation No. W912LA–05–B–0001 (the "Solicitation") for a project entitled Repair/Construct Maintenance Hanger and Shops (the "Project") for the Air National Guard ("ANG") located in Fresno, California. The Project involved general construction and remodeling work of the maintenance hanger and shops and associated sitework. Work included demolishing building components and walks, paving and landscaping, and constructing a building addition and remodeling of existing buildings, as well as site improvements, such as pavement, landscaping, and replacement of roofing systems. The Project required

---

1. The following facts, and those recited in more detail in the discussion, are findings of fact based on the administrative record, as supplemented. *See MTB Group, Inc. v. United States*, 65 Fed.Cl. 516, 523–24 (2005); *Bannum, Inc. v. United States*, 60 Fed.Cl. 718, 725 (2004), *vacated and remanded on other grounds*, 404 F.3d 1346 (Fed. Cir.2005).

contractors to supply all labor, services, and materials to complete the work.

The ANG issued the invitation for bids as an unrestricted solicitation for full and fair competition to award a firm fixed-price contract. Offerors were required to submit sealed offers on June 2, 2005. The Solicitation also required offerors to submit a bid guarantee in the form of bond issued by a surety, known as a "bid bond."

Aeroplate Corporation ("plaintiff") was one of five bidders whose bids were opened publicly on June 2, 2005. Plaintiff submitted a bid of approximately $6.5 million for base performance and $0.8 million on fifteen options. By letter dated June 29, 2005, ANG's Chief, Purchasing and Contracting Division, Lt. Col. Eric H. McDonald, informed plaintiff that ANG was rejecting its bid as nonresponsive. The letter recites that the bid bond plaintiff submitted was "executed improperly" because plaintiff failed to affix its corporate seal on the front of the form number SF 24. It also states that the surety that issued the bond, Arch Insurance Company ("Arch Insurance"), had notified ANG after bid opening that it did not authorize a bid bond for the amount of the bid, but, rather, that it only authorized a bid for $5.0 million not to exceed $5.5 million. Lt. Col. McDonald's June 29 letter cites Federal Acquisition Regulation (FAR) § 14.404–2, 48 C.F.R. § 14.404–2 (2004), and ANG's inability to "definitively determine [if] the government would receive the penal amount [of the bid bond] if circumstances forced [it] to collect[,] as the basis for the Guard's rejection of plaintiff's bid as nonresponsive." ANG awarded Contract No. W912LA–05–C–0007 to R.A. Burch Construction Co., Inc., on June 29, 2005.

Lt. Col. McDonald also wrote a letter, dated June 30, 2005, to plaintiff wherein he again stated that, although plaintiff was the "apparent low bidder," ANG rejected its bid as nonresponsive. This letter, however, adds that plaintiff was not the actual low bidder. It states that ANG granted R.A. Burch's request to change the amount of its bid from $77.1 million to $7.1 million due to a clerical error. It also states that ANG exercised CLIN 0016 as part of the initial award.

On July 8, 2005, plaintiff filed a complaint for declaratory and injunctive relief and application for temporary restraining order, along with a motion for preliminary injunctive relief. After a hearing held on July 14, 2005, this court granted plaintiff's application and motion for interim injunctive relief pending a ruling on the parties' cross-motions for judgment on the administrative record, which were subject to an expedited briefing schedule. See Aeroplate Corp., No. 05–736C, 2005 WL 1840044, 67 Fed.Cl. 1.

Plaintiff thereafter moved for judgment on the administrative record, arguing that ANG's conduct in rejecting plaintiff's bid as nonresponsive was arbitrary, capricious, and/or otherwise not in accordance with the law. Plaintiff seeks a permanent injunction prohibiting ANG from issuing a notice to proceed on the Project to any entity other than plaintiff.

Defendant cross-moved for judgment on the administrative record, arguing that the administrative record substantiates ANG's decision as reasonable; that ANG determined plaintiff as nonresponsible, in any event; that the doctrine of unclean hands should disqualify plaintiff from the relief that it seeks, given plaintiff's acknowledgment that the surety was not going to provide the payment and performance bonds if the contract were awarded to plaintiff.

Plaintiff's reply brief filed on August 2, 2005, included a separate Motion To File a First Amended Complaint, which requests a stay of proceedings on the ground that the Small Business Administration (the "SBA") has exclusive jurisdiction to make the determination whether plaintiff is a responsible bidder.

## DISCUSSION

### I. Jurisdiction

Plaintiff—ostensibly exercising the highest degree of candor—alerted the court to a potential jurisdictional deficiency in its own complaint. Plaintiff draws this court's attention to a document filed by defendant as part of the administrative record. A June 29, 2005 revised Determination of Responsibility

authored by Warrant Officer Mike D. Mitchell, the Contract Specialist (whom defendant identifies as the bid opening officer and Contract Administrator), concludes that plaintiff "does not meet the responsibility requirements of FAR [§ ] 9.104–1(a) & (b); therefore they are not qualified to receive this award. I recommend they not be awarded this contract."

Plaintiff informs the court that jurisdiction cannot be exercised over a bid protest filed by a contractor that is determined to be nonresponsible "until after the SBA has issued, or refused to issue, a [Certificate of Competency ('COC') ]." Pl.'s Br. filed Aug. 2, 2005, at 2. 13 C.F.R. § 125.5(a)(2) provides: "A contracting officer must, upon determining an apparent low small business offeror to be nonresponsible, refer that small business to SBA for a possible COC, even if the next low apparently responsible offeror is also a small business." Plaintiff asserts that, at present, jurisdiction over the complaint is premature in that the court lacks jurisdiction either to pass on the merits of plaintiff's challenge to ANG's nonresponsive determination or to enter a judgment for defendant. Because plaintiff deems Contract Specialist Mitchell's June 29, 2005 memorandum "a determination that [plaintiff] was not responsible[,]" plaintiff contends that ANG was required to refer the matter to the SBA. See FAR § 19.602–1. Plaintiff goes so far as stating that, "Arguably, just the notice to this Court that the contracting officer made a determination that [plaintiff] was nonresponsible would require this Court to order the Defendant to obtain a COC." Pl.'s Br. filed Aug. 2, 2005, at 2. Plaintiff requests a continuation of the "stay," see (proposed) Amended Complaint attached to Pl.'s Motion To File a First Amended Complaint, filed Aug. 2, 2005, at 4, pending the SBA's determination.

■ As this court explained in *Stapp Towing Inc. v. United States,* 34 Fed.Cl. 300, 302 (1995), a disappointed small business bidder rejected on the basis of a nonresponsibility is "entitled, as a small business, to request an SBA determination of the company's responsibility under its Certificate of Competency ... program." The program was explained, as follows:

Under the program the SBA makes a determination of a small business' responsibility to perform under a contract. After considering all aspects of a business' responsibility, the SBA determines whether or not to issue a COC. If the SBA issues the COC, the procuring agency must accept the SBA's responsibility determination as final. However, if the SBA declines to issue a COC, the contracting officer nevertheless may award the contract based on independent judgment and new information.

Upon determining that a small business is non-responsible, the contacting officer must notify the SBA of its determination. The agency then withholds award of the contract for up to 15 working days following receipt by the SBA of the notice of that determination.

*Id.* at 302; *see also C & G Excavating, Inc. v. United States,* 32 Fed.Cl. 231, 236 (1994).

■ Although the administrative record in this case bears out plaintiff's assertion that ANG indeed made a determination that plaintiff was nonresponsible, ANG was under no obligation to notify the SBA because it concurrently rejected plaintiff's bid on other grounds. Mr. McDonald's June 29, 2005 rejection letter for the ANG recited that the rejection was based on deficiencies associated with the bid bond. As defendant pointed out during argument, FAR § 9.104–3(d)(1), the regulation that compels the procuring officer to refer the small business to the SBA for a COC, provides: "If a small business concern's offer that would otherwise be accepted is to be rejected because of a determination of nonresponsibility, the contracting officer shall refer the matter to the Small Business Administration[.]" The express language of this regulation triggers a procuring agency's obligation to refer a bidder to the SBA not solely when it determines the bidder to be nonresponsible, but when the bidder has submitted a bid that "would otherwise be accepted" and is "to be rejected because of a determination of nonresponsibility." ANG's decision not to refer the matter to the SBA was correct at the time because plaintiff's bid would not "otherwise be accepted," given that the ANG had determined it to be nonre-

sponsive. In addition, ANG did not reject plaintiff's bid "because of a determination of nonresponsibility." Plaintiff painted the picture of a procuring official with two letters in his hand: one a determination of nonresponsiveness and one a determination of nonresponsibility. Even though that is not an accurate statement, plaintiff's argument that such a scenario would be unacceptable because a procuring official, with such a choice, would never refer the matter to the SBA, is answered definitively by the regulation.

However, the court does agree with plaintiff in that if ANG's rejection of plaintiff's bid as nonresponsive is found to be arbitrary, capricious, or otherwise contrary to law, ANG would be required to refer the matter to the SBA.

## II. Standard of review

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874 (the "ADRA"), provides this court with jurisdiction over actions brought by a disappointed bidder in a government procurement. The ADRA specifically made applicable the standard of review set forth in section 706 of the Administrative Procedure Act (the "APA"). 28 U.S.C. § 1491(b)(4) (2000). Subsection (2)(A) of section 706 provides the standard in cases brought under the ADRA, *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed.Cir.2004), and the court has discretion to set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706(2)(A); *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224–28 (Fed.Cir.2004) (holding that ADRA, in incorporating arbitrary and capricious standard of APA, did not alter court's equitable discretion in granting injunctive relief).

█ The arbitrary and capricious standard contemplates that review will consist of determining whether (1) a rational basis for the agency's decision is lacking or (2) a violation of an applicable regulation or a procedure occurred during the procurement procedure. *Banknote Corp. of Am.*, 365 F.3d at 1351; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333

(Fed.Cir.2001); *see Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996). Under the first ground, a court must determine "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion[.]' " *Impresa Construzioni*, 238 F.3d at 1332 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994)). A protestor, in such a situation, has the burden of showing that the agency's award decision had no rational basis. *Id.*

The parties cross-moved for judgment on the administrative record pursuant to RCFC 56.1. Rule 56.1 provides a procedure for an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.Cir.2005). Unlike a motion for summary judgment, a genuine dispute as to a material fact will not preclude a judgment on the administrative record. *See id.* The parties are restricted to the agency record and any supplementation consistent with RCFC 56(a) & (b). *See* RCFC 56.1(a).

## III. Reasonableness of ANG's determination of responsiveness

█ Lt. Col. McDonald's June 29, 2005 rejection letter for ANG states that one of the two reasons why plaintiff's bid was rejected as nonresponsive for submitting "an invalid Bid Bond" was plaintiff's failure to affix its corporate seal to the SF 24. Defendant does not defend ANG's rejection of plaintiff's bid on this basis; counsel concedes that ANG's conclusion that lack of a corporate seal renders a bid bond unenforceable was in error. Def.'s Br. filed July 28, 2005, at 15. The relevancy of the lack of a corporate seal on the bid bond, however, according to defendant, is that it prompted an investigation which led to information that the surety did not authorize the bid bond.

It was that conclusion that manifested as the second basis in the June 29 rejection letter: "[I]t is not clear to the government that the surety feels liable for the penal amount of the bond." Plaintiff contends that this finding lacks any rational basis and is contrary to law because, where a bid is oth-

erwise valid, the Government's "discretion to reject the bid for non-responsiveness ends once the bid bond satisfies the requirements of the Solicitation." Pl.'s Br. filed July 22, 2005, at 7.

The administrative record details the events that transpired between June 2, 2005, the date on which ANG opened the bids, and June 29, 2005, the date on which ANG rejected plaintiff's bid. Mr. Mitchell, the Contract Administrator, was the bid opening officer who began investigating plaintiff's bid bond when he noticed that the SF 24 bid bond lacked plaintiff's corporate seal. He prompted legal inquiry into the effect of such a failure by the State Judge Advocate. Meanwhile, he continued his responsibility determination.

Contract Administrator Mitchell's investigation into the financial status of plaintiff during early June 2005 revealed a low credit capacity, low income level, and a bonding limit lower than the bond submitted with plaintiff's bid for the project. His June 15, 2005 Determination of Responsibility explained that, although plaintiff had an "excellent financial history" with its bank, he had learned that (1) plaintiff was at the time performing on two construction contracts valued at over $3.8 million, (2) plaintiff had a "low credit capacity[,]" and (3) plaintiff reported its bonding capacity as $4 million per contract and $7 million aggregate on plaintiff's SBA profile. Mr. Mitchell was concerned that plaintiff's "monthly expenses might exceed their credit capacity[,]" as he expressed in his June 15, 2005 findings.

The June 15, 2005 memorandum also records that Mr. Mitchell spoke with Willis Risk & Insurance ("Willis"), the agent with power of attorney for Arch Insurance that executed the bid bond. Willis's representatives informed Mr. Mitchell that the largest bond Willis issued for plaintiff in the past was $3.2 million and that, the SBA profile notwithstanding, Willis agreed to provide a bond for up to $7.3 million for this contract.

Despite these concerns, Mr. Mitchell ultimately concluded that plaintiff was "generally qualified and eligible to receive this award." [2] Apparently alleviating his concerns, and as reflected in his June 15, 2005 Determination of Responsibility, was a June 13, 2005 telephone call with Mary Williams, the co-owner of plaintiff, who assured Mr. Mitchell that plaintiff's gross income was now higher than that reported in the SBA profile; that the bank opened a new $400,000.00 line of credit specifically for this project; and that her husband and co-owner Bill Williams [3] had private resources available, if necessary.

Subsequent to the apparent close of Contract Administrator Mitchell's investigation, new events transpired that led to his June 29, 2005 revised Determination of Responsibility, wherein he retracted his previous approval and recommended against award. According to the June 29 memorandum, Mr. Mitchell received a voicemail message on June 20 from Ken Huff at Arch Insurance "informing us Aeroplate submitted an invalid bid bond." Mr. Mitchell followed up on what defendant emphasizes was an "unsolicited" phone call, Def.'s Br. filed July 28, 2005, at 16, by speaking with Arch Insurance's "Senior Surety Counsel," Susan Neff. Mr. Mitchell's June 15 memorandum states that Ms. Neff informed him that Arch Insurance authorized the bid bond to cover no more than $5.5 million. According to his memorandum, Ms. Neff explained that Arch Insurance found out a week prior that plaintiff's bid was actually $7.3 million and that Arch Insurance "instructed [plaintiff] to withdraw its bid," but that plaintiff refused and instead requested Arch Insurance to evaluate plaintiff's finances to determine if plaintiff would qualify for the higher amount. A handwritten "Phonecon Record" by Mr. Mitchell dated June 21, 2005, indicates that Ms. Neff informed him that Arch was "unlikely to underwrite bonds." (Underscoring omitted.)

---

2. Defendant notes that Mr. Mitchell's "positive responsibility determination" occurred before ANG received all necessary funding for the project. Def.'s Br. filed July 28, 2005, at 5. All bids included amounts over the available funds. *Id.* at 5 n. 4.

3. Plaintiff did not contest defendant's assertion that Mary Williams and Bill Williams are co-owners of plaintiff. *See* Def.'s Stat. of Facts filed July 28, 2005, ¶ 24.

Another of Mr. Mitchell's Phonecon Records of June 22, 2005, states that Ms. Neff informed him that Arch Insurance would not issue the performance and payment bonds. Mr. Mitchell wrote in his June 29 revised Determination of Responsibility that "Ms. Neff called me and informed me that even if we awarded the contract to Aeroplate, they would not provide the performance and payment bonds required for an award [in the amount bid]." The phone communication record for that date documents a call between Mr. Mitchell and Ms. Neff. It reflects what Mr. Mitchell wrote in his June 29 memorandum and also records that Ms. Neff stated that "Bill Williams [plaintiff's co-owner] called Willis, (Brooke) & Brooke told Bill to submit bid."

Mr. Mitchell's June 29 revised Determination of Responsibility reflects that on June 23, 2005, he telephoned Mr. Williams, who "admitted that Arch wasn't going to provide the performance and payment bonds if Aeroplate received the award. He told me he was talking to several other surety companies, in particular, Traveler's, and he should have approval from one of them by 24 Jun 05." Mr. Mitchell's Phonecon Record dated June 23, 2005, materially confirms this. It documents a telephone conversation with Mr. Williams, who "[a]dmitted Arch won't Bond them." Mr. Mitchell's record continues: "Looking for other sureties. Thinks Traveler's should know by tomorrow. Told him . . . [illegible] . . . he'll have 10 days to get bonds."

Contract Administrator Mitchell states in his June 29, 2005 revised Determination of Responsibility that, after checking with Mr. Williams again on July 27, 2005, he received on June 28 copy of a letter from I.S./N.A.R.I. that indicated that a company called S.S.I. Risk Management/I.S. would provide the performance and payment bonds. Mr. Mitchell's memorandum describes in detail

his investigation into that surety, which led him to discover that the surety was not approved by the Department of the Treasury, but that it was an individual surety. After further investigation Mr. Mitchell concluded that the individual surety "appears to be under investigation for securities fraud in many different states." Mr. Mitchell's June 29 memorandum [4] thus recommended against award, citing plaintiff's failure to meet the responsibility requirements of FAR § 9.104–1(a) and (b).[5]

Defendant contends that, "given that [plaintiff] admitted to the [Contracting Administrator] that it didn't have bonding, and never denied that it knew Arch had not authorized the bid, the [Contracting Administrator]'s conclusion that 'it's not assured Arch would feel obligated to honor the bid bond[,]' was reasonable." Def.'s Br. filed July 28, 2005, at 19 (alterations in original; citation omitted). Plaintiff counters that the procuring agency had no discretion to determine the enforceability of a bid bond that is facially valid. The question for decision is whether and under what circumstances a procuring official has the right to reject a bid as nonresponsive.

The parties agree that the responsiveness determination of a surety bid and performance bonds is governed by FAR § 52.228–1, which provides:

(a) Failure to furnish a bid guarantee in the proper form and amount, by the time set for opening of bids, may be cause for rejection of the bid.

(b) The bidder shall furnish a bid guarantee in the form of *a firm commitment, e.g., bid bond supported by good and sufficient surety or sureties acceptable to the Government,* postal money order, certified check, cashier's check, irrevocable letter of credit, or, under Treasury Department

---

4. The revised Determination of Responsibility dated June 29, 2005, was not included in the administrative record initially assembled for purposes of the hearing that led to the July 15, 2005 interim injunction.

5. FAR § 9.104–1 provides, in part:
To be determined responsible, a prospective contractor must—

(a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104–3(a));
(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments[.]

regulations, certain bonds or notes of the United States. The Contracting Officer will return bid guarantees, other than bid bonds, (1) to unsuccessful bidders as soon as practicable after the opening of bids, and (2) to the successful bidder upon execution of contractual documents and bonds (including any necessary coinsurance or reinsurance agreements), as required by the bid as accepted.

(c) The amount of the bid guarantee shall be ___ percent of the bid price or $___, whichever is less.

(d) If the successful bidder, upon acceptance of its bid by the Government within the period specified for acceptance, fails to execute all contractual documents or furnish executed bond(s) within 10 days after receipt of the forms by the bidder, the Contracting Officer may terminate the contract for default.

(e) In the event the contract is terminated for default, the bidder is liable for any cost of acquiring the work that exceeds the amount of its bid, and the bid guarantee is available to offset the difference.

(Emphasis added.)

The parties' dispute focuses on the language of FAR § 52.228–1(b) that states, in part, that the bid guarantee must be "in the form of a firm commitment, e.g., bid bond supported by good and sufficient surety or sureties acceptable to the Government[.]" Plaintiff argues that the bid guarantee submitted was supported by a surety acceptable to the Government because Arch Insurance was listed on the Department of the Treasury's approved surety list, a fact not in dispute. Plaintiff reads this regulation to provide no further requirement with respect to the bid guarantee: So long as the bid guarantee is proper on its face, the bidder has satisfied its obligations. Whether the surety will actually issue the performance and payment bonds, if the contract is awarded, is another question, but one that the FAR contemplates and for which it provides recourse, as will be discussed.

Defendant vehemently disputes plaintiff's reading of this regulation. Defendant contends that the express purpose of the bid guarantee is to "provide assurances that the bidder 'will execute a written contract and furnish required bonds, including any necessary coinsurance or reinsurance agreements, within the time specified in the bid[.]' " Def.'s Br. filed July 28, 2005, at 17 (quoting 48 C.F.R. § 28.0041(2)). Defendant presses the argument that, as a matter of regulation and policy, a procuring officer is not restricted to the "superficial, truncated review urged by [plaintiff,]" namely—that the procuring agency cannot look past a facially valid bid bond. Def.'s Br. filed July 28, 2005, at 20.

Defendant's invocation of the regulation's language of "firm commitment" and "acceptable to the Government" as the basis by which the procuring official can look behind the otherwise facial validity of a bid bond advocates a position that it recognizes would carve out an exception to the rule. As plaintiff correctly points out, the "determinative question" as to the validity of a bid guarantee is whether, at the time of bid opening, the bond is enforceable against the surety should the bidder fail to meet its obligations. Pl.'s Br. filed July 22, 2005, at 7. This court stated this rule of law in *Hawaiian Dredging Construction Co. v. United States*, 59 Fed.Cl. 305, 310–11 (2004), upon which plaintiff relies.

In *Hawaiian Dredging* a disappointed bidder disputed a nonresponsiveness determination based on the lack of original signatures on the powers of attorney accompanying the bid bonds. In setting aside the procuring agency's determination, this court stated that "[t]he overarching issue is whether the contracting officer reasonably concluded that he could not establish unequivocally at the time of bid opening that plaintiff's bid bonds were enforceable against the surety." *Hawaiian Dredging*, 59 Fed.Cl. at 310. It is firmly established that "[b]id responsiveness is determined at the time bidding is opened[.]" *Skytech Aero, Inc. v. United States*, 26 Cl.Ct. 251, 254 (1992); *see also In re Noslot Pest Control Inc.*, 1989 WL 237476, 68 Comp. Gen. 396 (1989).

Defendant argues that this is an unusual circumstance that justifies carving what it is confident will prove to be a narrow exception to this rule. The court certainly agrees that

these circumstances are extreme. The procuring agency received information from the surety that it would not issue the bonds, and that information was confirmed by a co-owner and thus a principal of plaintiff. Defendant contends that it would be pointless and a waste of time and resources to force a procuring official, with that knowledge and an admission from the bidder, to go forward with award and then default the contractor.

While defendant's position has superficial appeal, it would deprive the established law of suretyship of the certainty that has been its hallmark. First, the FAR mandates a procedure to protect the Government in these precise circumstances.[6] FAR § 52.228–1(d) provides the procedure, and subsection (e), the protection:

> (d) If the successful bidder, upon acceptance of its bid by the Government, within the period specified for acceptance, fails to execute all contractual documents or furnish executed bond(s) within 10 days after receipt of the forms by the bidder, the Contracting Officer may terminate the contract for default.
>
> (e) In the event the contract is terminated for default, the bidder is liable for any cost of acquiring the work that exceeds the amount of its bid, *and the bid guarantee is available to offset the difference.*

(Emphasis added.) The Government's dispute is with the procedures themselves. It is not for the trial court to devise a procedure that fills in a gap that the FAR does not recognize as a critical interval. Specifically, the administrative record reveals that Arch Insurance will not deliver the performance bond if the contract is awarded to plaintiff; that plaintiff may or may not have been authorized to submit the surety's bid bond; that plaintiff did not have a surety in place; and that the one currently under consideration is suspect. The FAR provides that the

bid guarantee will be called on if the contractor cannot deliver the performance bond when required. Were the court to rule that Contract Administrator Mitchell could avert further delay by taking preemptive action, the door would open for any surety after bid opening and upon further reflection to call in its disinclination not to make good on an otherwise valid, authorized guarantee. The certainty and predictability of reliance on surety guarantees would be hostage to the whims of the surety. Indeed, if a surety notified the procuring official of its disinclination and the latter decided to proceed nonetheless and hold the surety to its commitment, a new cause of action could be spawned.

Defendant's position also cannot be sustained because it would require the court to find the terms "firm commitment" and "reasonably acceptable to the Government" to provide the regulatory authority for the procuring officer's exercise of discretion after bid opening and after receipt of an otherwise facially valid bid bond. Plaintiff's admission in the phone call between Mr. Mitchell and Mr. Williams appears in the handwritten Phonecon Record as "[a]dmitted Arch won't bond them. Looking for other sureties." That does not equate to an admission that the bid guarantee was invalid, *i.e.,* that it was not an enforceable contract. At most, it is a candid statement that the surety may be backing out of what was a firm commitment.

If this court were to allow the Government to interpret broadly the term "firm commitment" to extend beyond what it means at the time of bid opening, procuring officials would be able to inquire with the surety to learn if the surety will actually do what it promised to do. The exception urged by defendant would swallow the rule. It would also be impossible to determine what level of reliability of evidence a procuring official could base such a decision on without basically legislat-

---

6. Plaintiff has postulated that the ANG's concerns over the likelihood that plaintiff would produce performance and payment bonds, notwithstanding a valid bid guarantee, constitute questions of responsibility, not responsiveness. *Cf. In re Noslot Pest Control,* 1989 WL 237476, at *2, 68 Comp. Gen. 396, 398–99 ("Since each of the sureties properly executed a bid bond in a sufficient amount and submitted an affidavit

showing a net worth in excess of the amount of the bond, and there are no other obvious defects detracting from the sureties' liability on the bonds, the bonds on their face are acceptable. Whether the assets listed in the sureties' affidavits are acceptable and sufficient to support the bonds is a matter of responsibility, and does not affect the responsiveness of the bids.")

ing new procedure. That is not this court's role.

While defendant urges expediently that the ruling it seeks would protect the Government better than the regulation, the real protection would be accorded the surety, which now would be able to back out of a "firm commitment" whenever it chooses merely by giving word to the agency. Even bidders would reap a benefit from such a ruling, for if a surety with second doubts creates a reasonable basis to justify rejection of a bid, then the bidder itself could take advantage and assert the same basis to justify withdrawal of its bid.

Remarkably, defendant goes as far as to offer a contractor an easy opt-out post-bid opening option: "[Plaintiff's] bid was based upon the mistake that it possessed a bid bond that covered the entire sum of its bid." Def.'s Br. filed July 28, 2005, at 21. The FAR constrains a bidder's ability to withdraw to discrete circumstances that are set forth in FAR § 14.407–1 to –4. The circumstances include clerical errors, *see* FAR § 14.407–2, or "clear and convincing evidence" of certain kinds of mistakes, *see* FAR § 14.407–3. Indeed, the contracting agency's authority to permit correction of a mistake expressly is limited to bids that are otherwise responsive: "The authority to permit correction of bids is limited to bids that, as submitted, are responsive to the invitation and may not be used to permit correction of bids to make then responsive." *Id.* The regulation is abundantly clear; and, even were it not, surely the Government does not intend to provide bidders with a new means to avoid a firm commitment.

IV. *Injunctive relief*

█ The Federal Circuit has described injunctive relief as "extraordinary relief." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993); *see CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983). In order to obtain a permanent injunction, plaintiff must demonstrate by a preponderance of the evidence that (1) it has achieved actual success on the merits; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an in-

junction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction serves the public interest. *PGBA,* 389 F.3d at 1228–29; *FMC Corp.,* 3 F.3d at 427. No one of the four factors is determinative. *FMC Corp.,* 3 F.3d at 427. "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

Plaintiff has demonstrated success on the merits of its claim. In issuing a preliminary injunction, the court found that plaintiff satisfied the requirement to demonstrate irreparable harm and adopts it. *See Aeroplate, Inc.,* No. 05–736C, 2005 WL 1840044, 67 Fed. Cl. 1. The calculus of respective harm has changed, because the delay that was deemed nonprejudicial in the prior order was attributable to delay in funding. The funding is in hand. As the COC determination by regulation prescribes a further fifteen-day period of delay, the FAR contemplates that delay can and will occur after award when the award involves a small business. Plaintiff has proceeded post haste, in any event.

It is in the public interest for the Government to conduct fair procurement procedures, and to give honest and fair consideration to all bids. *Parcel 49C Ltd. P'ship v. United States,* 31 F.3d 1147, 1152 (Fed.Cir. 1994); *see Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 846 n. 9 (D.C.Cir.1982).

It is not the province of the court to adopt ad hoc procedures to relieve the procuring agency of difficult and potentially delaying situations. The overriding consideration is the established law of suretyship. The surety issued a facially valid bid bond. The surety changed its mind, or the surety may not have authorized plaintiff to tender the bond (although the administrative record is equivocal on this point). In these circumstances it is the surety that must answer should the contractor be unable to deliver the performance bond.

Because the court finds ANG's nonresponsiveness determination to be arbitrary, capricious, or otherwise contrary to law, the only basis in the administrative record and confirmed by counsel during argument to justify the rejection is the nonresponsibility determination. ANG is obliged by FAR § 19.602–1 to refer this matter to the SBA for a COC determination.

## CONCLUSION [7]

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Plaintiff's motion to file a first amended complaint is granted as unopposed, and the Amended Complaint is filed this date.

2. The preliminary injunction issued on July 15, 2005, is continued for the duration of the stay herein ordered, subject to being converted to a permanent injunction or dissolved, depending on the results of the COC determination. Defendant, through the Departments of the Army and the Air Force National Guard Bureau, its officers, agents, employees, and all other persons acting in connection therewith, shall not issue a notice to proceed to R.A. Burch Construction, Inc., or otherwise initiate performance of Contract No. W912LA–05–C–0007 Repair/Construction Maintenance Hanger & Shops, Fresno Air National Guard Station, Fresno, CA, subject to further order of the court.

3. This action is stayed, and any action to proceed on the contract is stayed pending the SBA determination and any further order of the court.

4. Pursuant to 48 C.F.R. § 19.602–1, ANG shall provide notice to the Small Business Administration that it has determined that plaintiff lacks certain elements of responsibility.

5. By the earlier of five (5) calendar days after receipt of a determination of COC by the SBA, or by August 29, 2005, defendant shall file a status report informing the court of the SBA's determination, and any action taken by ANG with respect to it.

6. A copy of this order was transmitted to counsel this date by facsimile transmission.

---

7. Defendant objected to the addition of documents that were generated prior to contract award. *See* Order entered on July 22, 2005 (order granting plaintiff's motion to supplement record). These documents properly are part of the record in this case, *see MTB Group, Inc. v. United States*, 65 Fed.Cl. 516, 523–24 (2005), although they were not generated before or at the time of contract award. One of the documents is Lt. Col. McDonald's June 30, 2005 notification to plaintiff that the contract was awarded to another bidder and the basis for rejection. The other is an innocuous declaration from Mr. Williams affirming that plaintiff's bid was not mistaken. Plaintiff moved on August 2, 2005, to strike a Phonecon Record dated June 20, 2005, insofar as defendant offers it for the truth of the matters asserted. The document qualifies as a business record, Fed.R.Evid. 803(6), although the court noted that defendant attributed language to it that is not present.