**BLUE & GOLD FLEET, LP, Plaintiff,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**Hornblower Yachts, Inc., Defendant–Intervenors.**

**No. 05–1203C.**

United States Court of Federal Claims.

March 22, 2006.

---

Alan I. Saltman, Washington, DC, for plaintiff. Ruth G. Tiger and Isaias Alba IV, Saltman & Stevens, P.C., of counsel.

Sean M. Dunn, Department of Justice, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Molly N. Ross, Assistant Solicitor General, National Park Service, U.S. Department of the Interior, of counsel.

Kevin R. Garden, Alexandria, VA, for defendant-intervenor Hornblower Yachts, Inc., Brian Bannon and Andrew W. Dyer, Jr., Blank Rome LLP, Washington, DC, of counsel.

Gabriel A. Terrasa, Owings Mill, MD, for International Organization of Masters, Mates & Pilots, ILA, amicus curiae.

Dmitri Iglitzin, Seattle, WA, for Inlandboatmens Union of the Pacific, amicus curiae.

## OPINION [1]

CHRISTINE O.C. MILLER, Judge.

This pre-award bid protest involves a dispute over the provision for ferry services to the historic Alcatraz Island near San Francisco, California. Blue & Gold Fleet, LP ("plaintiff"), the incumbent contractor, and defendant-intervenor Hornblower Yachts, Inc. ("Hornblower"), the prospective awardee, submitted ferry-service proposals to the National Park Service (the "Park Service"). Plaintiff protests the award of the contract to Hornblower, alleging that the selection was without rational basis and seeks to enjoin the Park Service from awarding the contract. The parties have moved for judgment on the administrative record, and argument has been held.

## BACKGROUND [2]

Alcatraz Island, for the unfamiliar, is a National Historic Landmark site that is part of the Golden Gate National Recreation Area in San Francisco. The Island, also known as "The Rock," was first a military fort, then a lighthouse, and finally (and most famously) a high-security federal prison, housing notorious inmates such as Robert "Birdman" Stroud, Al "Scarface" Capone, and George "Machine Gun" Kelly. In 1963 Alcatraz's notoriety as a prison came to an end. Some years later it was converted to a tourist destination. Alcatraz is quite popular—demand to visit the former penitentiary often far exceeds the supply of tickets. The Island historically receives over 1.3 million visitors per year and generates over $13 million per year in revenue.

Plaintiff is the current operator of the ferry service to and from Alcatraz Island and runs between fourteen and eighteen round trips per day to the island. Its ferries leave from Pier 41, a location close to the shops and restaurants of Pier 39 and Fisherman's Wharf.

The Park Service, the Government entity responsible for the maintenance of Alcatraz, is also responsible for the solicitation and selection of contractors to provide ferry transportation, sell concessions, and perform other Alcatraz-related services. The Park Service's solicitation of proposals for the Alcatraz concession contract and its selection of

---

1. This opinion originally was filed under seal on March 6, 2006. By ¶ 2 the parties were requested to notify the court of any redactions. The parties approached the task with such zeal, if not consistency, that the redacted opinion adds little to the case law on injunctive relief. All redactions requested are denoted by brackets.

2. Documents that are not self-identified are cited to the administrative record (the "AR").

The court carefully has examined the administrative record (as supplemented). To the extent that the facts are disputed by the parties, the facts recited in this opinion constitute findings of fact. See Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed.Cir.2005) ("The Court of Federal Claims ... when making a prejudice analysis in the first instance, is required to make factual findings under RCFC 56.1 from the record evidence as if it were conducting a trial on the record.").

Hornblower as the new contractor drive this dispute.

Hornblower provides hospitality cruises in the California area. The Park Service selected its proposal to provide the Alcatraz ferry and concession services.[3] Hornblower's proposed facilities would be built on Pier 33, which is less than one-half mile from Pier 39 and Fisherman's Wharf.

On July 27, 2004, the Park Service issued a notice of availability of a prospectus for the solicitation of proposals for the Alcatraz concession contract.[4] The proposed contract was to include land and water transportation to and from the island, food and beverage services, ticket sales, as well as maintenance of visitor arrival, assembly, and departure facilities. The proposed contractual term is ten years. The Park Service gave offerors the opportunity to ask questions regarding the prospectus and provided its responses to all potential offerors who had requested the prospectus. The prospectus included detailed Proposal Instructions that directed any offerors who believed the prospectus was inaccurate to submit comments to the Park Service no later than thirty days prior to the due date of the proposals. The closing date for the receipt of the proposals originally was November 24, 2004, but was extended to March 30, 2005.

The Proposal Instructions, AR 7574–79, state that "[o]nly an Offeror submitting a responsive proposal is eligible to be awarded the new Concession Contract." AR 7574. It goes on to define a "responsive proposal" as a "timely submitted proposal that is determined by the Director as agreeing to all of the minimum requirements of the new Concession Contract and Prospectus and as having provided the information required by the Prospectus." AR 7574. "Information required by the prospectus" is defined as "information expressly required by the Prospectus and [information] that is material, as determined by the [Park] Service, to effec-tive evaluation of the proposal under the applicable selection factor." AR 7574.

The Proposal Instructions stated that, when evaluating the proposals, "[t]he Director will apply the principal selection factors and secondary selection factors as set forth in 36 CFR Part 51 by assessing each timely proposal under each of the selection factors on the basis of a narrative explanation discussing any subfactors when applicable and other supporting quantitative information." AR 7576. The selection factors were, as follows:

(1) *Principal Selection Factor 1.* The responsiveness of the proposal to the objectives, as described in the prospectus, of protecting, conserving, and preserving resources of the park area;

(2) *Principal Selection Factor 2.* The responsiveness of the proposal to the objectives, as described in the prospectus, of providing necessary and appropriate visitor services at reasonable rates;

(3) *Principal Selection Factor 3.* The experience and related background of the Offeror, including the past performance and expertise of the Offeror in providing the same or similar visitor services as those to be provided under the concession contract.

(4) *Principal Selection Factor 4.* The financial capability of the Offeror to carry out its proposal;

(5) *Principal Selection Factor 5.* The amount of the proposed minimum franchise fee, if any, and/or other forms of financial consideration to the Director. However, consideration of revenue to the United States will be subordinate to the objectives of protecting, conserving, and preserving resources of the park area and of providing necessary and appropriate visitor services to the public at reasonable rates.

(6) *Secondary Selection Factor 1.* The quality of the Offeror's proposal to conduct its operations in a manner that furthers

---

3. The contract, however, has not yet been awarded. The Park Service has agreed not to award the contract until at least March 3, 2006.

4. This competitive proposal solicitation process, and its criteria, are mandated by law. *See* The National Park Service Concessions Management Improvement Act of 1998, 16 U.S.C. § 5952 (2000).

the protection, conservation and preservation of the park area and other resources through environmental management programs and activities, including, without limitation, energy conservation, waste reduction, and recycling.

(7) *Secondary Selection Factor 2.* The offeror demonstrates its commitment to utilize state of the art technology(ies) and/or alternative fuel sources in its vessel operations to reduce emissions beyond those required for compliance.

AR 7576–77. Each selection factor was to receive a score that "reflects the determined merits of the proposal under the applicable selection factor and in comparison to the other proposals received." AR 7576. Principal Selection Factors 1—4 were to be scored from zero to five; Principal Selection Factor 5 was to be scored from zero to four; and each of the Secondary Selection Factors was to receive a score from zero to three. Scores were only given to principal and secondary selection factors; subfactors were not separately scored. *See* AR 7576–77.

The Park Service received proposals from plaintiff and Hornblower and two proposals from [* * *]. A panel was formed to evaluate the proposals. The panel consisted of eight Park Service employees and was aided by a staff of five technical advisors (including experts in the fields of government contracts, financial analysis, and large vessel emissions).[5] The panel was assembled fully by March 18, 2005.

The panel met for face-to-face deliberations on site in San Francisco during the week of April 11—15, 2005.[6] Different panel members were assigned in groups to evaluate each selection factor. These selection-factor groups then presented their conclusions to the entire panel. The final score for each factor was determined by a consensus of the entire panel formed after comparing all the proposals received.

After the panel broke from its on-site meeting, several panel members continued their work off-site. On May 6, 2005, the panel held a conference call during which the panel members reached agreement on the final recommended scores for each of the proposals. The Evaluation Panel Summary was finalized and delivered to various offices for review. On August 25, 2005, the panel submitted its recommendation to the Park Service's Regional Director, selecting Hornblower's as the winning proposal; the panel also recommended that all submitted proposals be considered "responsive" within the meaning of 36 C.F.R. § 51.13 (2005). The Regional Director agreed with both recommendations.

The Panel Evaluation Summary agreed to by the Regional Director is a [* * *] document that scored the various proposals by analyzing their responsiveness to the selection factors laid out in the prospectus.[7] Out of a total of 30 points, Hornblower scored [* * *]; plaintiff scored [* * *]; and the two

5. Two of the panel's technical advisors— [* * *]—were *dismissed due to potential con*flicts of interest Both Hornblower and plaintiff had used [* * *] as a consultant, and [* * *] had worked closely with [* * *] on the relevant selection factors.

[* * *] was the panel's expert on marine transportation, energy and the environment, air *emissions, and pollution. He was replaced by* [* * *], a United States Coast Guard-licensed marine engineer with a Bachelor of Sciences degree in Marine Engineering. [* * *] was supported by [* * *], a long-time environmental *consultant.*

At least two members of the panel found [* * *]'s work to be "disappoint[ing]" due to its lack of necessary detail. AR 8283. One felt that [* * *]. *Id.*

Plaintiff *suggests that this last-minute replacement of* [* * *] with allegedly less-than competent support staff led to some of the panel's

alleged misjudgments on scoring. However, *while it is troubling that the replacement advis*ors were not as effective as they might have been, they were advisors, not panel members. The replacement of [* * *] with [* * *] caused the panel [* * *], as one member noted, *id.,* but it *does not necessarily* [* * *].

6. Although the panel members received copies of the prospectus in advance of this meeting for review, they did not receive copies of the actual proposals until the week of the meeting.

7. The main document created by the panel was the [* * *] Panel Evaluation Summary. However, the panel also distilled the summary to a [* * *] memorandum to the Regional Director. The Park Service represented to the court at oral argument that, due to its brevity and purpose, this memorandum of recommendations was less accurate.

[* * *] proposals received scores of [* * *] and [* * *]. Hornblower's proposal scored higher than plaintiff's proposal in [* * *] and [* * *] in the remaining [* * *] selection factors.

Plaintiff disputes Hornblower's score for many of these selection factors. The specific challenges leveled by plaintiff will be examined in the following discussion. The parties have focused the court's review by identifying six categories of challenge: the alleged material misrepresentations in Hornblower's proposal; the failure to evaluate the proposed use of alternative-technology vessels; the possible misstatement of the number of required round trips; the errors in Hornblower's financial statements; and the misevaluation of Principal Selection Factors 1, 2, 3, 4, and 5 and Secondary Selection Factors 1 and 2.

## PROCEDURAL HISTORY

On September 26, 2005, the Park Service notified all offerors that Hornblower had been selected as having the best proposal. On October 6, 2005, plaintiff filed a protest with the Government Accountability Office (the "GAO") regarding the selection decision. On November 15, 2005, in response to concerns that the GAO lacked jurisdiction, plaintiff refiled this dispute in the United States Court of Federal Claims. The GAO then dismissed the protest because the matter was pending before a court of competent jurisdiction. *See* 4 C.F.R. § 21.11 (2004).

Plaintiff, defendant, and Hornblower ask the court for judgment on the administrative record pursuant to RCFC 56.1. Defendant served plaintiff with the initial administrative record on December 1, 2005. Plaintiff then requested certain supplement and clarifications, which defendant provided without objection on December 9, 2005. Subsequently, on December 23, 2005, plaintiff filed a motion for additional supplementation of the administrative record, which defendant and Hornblower opposed. This motion was granted in

part and denied in part, as discussed more fully in section 1.2 below.

## FACTS and DISCUSSION

I.  *Standard of review*

1.  *Standard of review in bid protest actions*

The Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), as amended by the Administrative Disputes Resolution Act of 1996 (the "ADRA"), Pub.L. No. 104–320, § 12(a), 110 Stat. 3870, 3874–75 (codified at 28 U.S.C. § 1491(b)), provides the United States Court of Federal Claims with jurisdiction over actions brought by a disappointed proposer in a government procurement. When evaluating agency action, the Act directs the court to use the standard of review set forth in section 706 of title 5, *i.e.*, the Administrative Procedure Act, 28 U.S.C. § 1491(b)(4) (2000) (the "APA"); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed.Cir. 2004). The APA confers discretion to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706(2)(A); *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224–28 (Fed.Cir. 2004) (holding that ADRA, in incorporating arbitrary and capricious standard of APA, did not alter court's equitable discretion in granting injunctive relief).

As restated recently by the United States Court of Appeals for the Federal Circuit, "A bid protest proceeds in two steps." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed.Cir.2005). First, the court determines if, under the arbitrary and capricious standard, the agency acted either (1) without rational basis, or (2) contrary to law.[8] *Bannum*, 404 F.3d at 1351; *see Banknote Corp.*, 365 F.3d at 1351; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed.Cir.2001); *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996); *Aeroplate Corp. v. United States*, 67 Fed.Cl. 4, 8 (2005). Second, if the court finds that the agency acted

---

8. This language encompasses the alternative ground for a bid protest: whether the agency action constituted a clear and prejudicial violation of an applicable procurement regulation.

*See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1335 (Fed.Cir. 2001).

in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. In either case the plaintiff bears the "heavy burden" of proving this lack of rational basis or violation of the law by a preponderance of the evidence. *Impresa*, 238 F.3d at 1333.

■ In making the initial determination whether the agency action lacks rational basis or is contrary to law or regulation, the court applies two analyses depending on the nature of the challenge. For an agency action to possess a rational basis, " 'the contracting agency [must] provide[ ] a coherent and reasonable explanation of its exercise of discretion[.]' " *Impresa*, 238 F.3d at 1332 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir.1994)). "In the context of a bid protest, an agency is entitled to wide discretion in its evaluation of bids." *CCL Serv. Corp. v. United States*, 48 Fed.Cl. 113, 120 (2000) (citing *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed.Cir.1994)). The court must not substitute its judgment for that of the agency, but, instead, should defer to the agency's analysis so long as it has substantial basis in fact. *See id.; see also Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Fed. Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972). In particular, technical ranking decisions made by the agency are "minutiae of the procurement process ... which involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir. 1996); *see CCL Serv.*, 48 Fed.Cl. at 120. In such situations, when government officials are granted a great deal of discretion, the "aggrieved party faces a higher burden...." *CCL Serv.*, 48 Fed.Cl. at 120 (citing *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 597–98 (1980)). The "sorting of proposals within the competitive range falls within the discretion" of the panel. *Id.*

Agency procurement procedures that are contrary to applicable laws and regulations also violate the APA standard. 5 U.S.C. § 706(2)(A); *Bannum*, 404 F.3d at 1351;

*Impresa*, 238 F.3d at 1335. Federal law requires an agency to "evaluate ... competitive proposals and make an award based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1) (2000). In contrast with the analysis of whether the agency decision has a rational basis, an agency has no discretion regarding the mandate of applicable laws and regulations. It is irrelevant whether the agency views the regulation or requirement of the solicitation as important; the agency is strictly bound by its terms " 'regardless of the panel's view of the appropriateness of the standard....' " *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367–68 (Fed.Cir.1999) (quoting *Alfa Laval Separation, Inc. v. United States*, 40 Fed.Cl. 215, 230 (1998)).

■ If the agency action is determined either to lack rational basis or to violate an applicable procurement regulation, the court proceeds to address whether the action was significantly prejudicial to the protestor. *Bannum*, 404 F.3d at 1351, 1353. "To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.' " *Galen Med. Assoc., Inc. v. United States*, 369 F.3d 1324, 1331 (Fed.Cir.2004) (quoting *Statistica, Inc.*, 102 F.3d at 1582). "Prejudice is a question of fact." *Bannum*, 404 F.3d at 1353; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir.2000).

### 2. Standard of review for judgment on the administrative record

The parties cross-moved for judgment on the administrative record pursuant to RCFC 56.1. Rule 56.1 provides a procedure for an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum*, 404 F.3d at 1356. Unlike a motion for summary judgment, a genuine dispute as to a material fact will not preclude a judgment on the administrative record. *See id.* The parties are restricted to the agency record and any supplementation consistent with RCFC 56(a) and (b). *See* RCFC 56.1(a). The court must make findings of fact from this record as if it was conducting a trial. *Bannum*, 404 F.3d at 1357.

▬ In certain circumstances the administrative record may be supplemented. *Impresa,* 238 F.3d at 1338 (supplementation is appropriate where "required for meaningful judicial review"); *GraphicData LLC v. United States,* 37 Fed.Cl. 771, 778–780 (1997); *see also CCL Serv.,* 48 Fed.Cl. at 118–20. In general, the court will supplement the administrative record when it is necessary for a full and complete understanding of the issues. *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. 502, 508 (2003) (allowing supplementation of "evidence without which the court cannot fully understand the issues"). The circumstances in which courts have allowed supplementation to the record created before the agency include the following:

(1) when agency action is not adequately explained in the record before the court;

(2) when the agency failed to consider factors which are relevant to its final decision;

(3) when an agency considered evidence which it failed to include in the record;

(4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;

(5) in cases where evidence arising after the agency actions shows whether the decision was correct or not; ....

(8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Stapp Towing, Inc. v. United States,* 34 Fed. Cl. 300, 308 (1995) (quoting *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)); *see also GraphicData,* 37 Fed.Cl. at 779.

In the instant case, plaintiff asked that the administrative record be supplemented by a laundry-list of items, some of which the court accepted, and some of which the court excluded. *See* Order entered Jan. 10, 2006. Plaintiff has launched a broad attack on the unsuitability of Hornblower to discharge the proposal requirements and the evaluation panel's allegedly baseless adoption of Horn-

blower's representations. In support of its motion, plaintiff represented that the supplemental materials would enable it to show Hornblower's "misrepresentations, miscalculations, and unrealistic claims...." Pl.'s Br. filed Jan. 3, 2006, at 41–42.

The court ruled that the administrative record properly could be supplemented to the extent that the additional materials would substantiate plaintiff's accusations of omissions and misrepresentations. *See* Order entered Jan. 10, 2006, at 1–2. However, it is now apparent that these additional materials do not constitute proper supplementation. These materials do not clarify any matter that was or was not considered at the agency level, as they do not represent information that should have been considered, was considered, was insufficiently considered, or was considered incorrectly. These items will not be relied upon.[9]

3. *Standard of review for injunctive relief*

▬ Plaintiff asks that the Park Service be enjoined from awarding the contract to Hornblower. The Federal Circuit has described injunctive relief as "extraordinary relief." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993); *see CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1581 (Fed. Cir.1983). In order to obtain an injunction, plaintiff must demonstrate by a preponderance of the evidence that (1) it succeeds on the merits; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest. *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004); *FMC Corp.,* 3 F.3d at 427; *see U.S. Ass'n of Importers of Textiles & Apparel v. United States,* 413 F.3d 1344, 1346 (Fed.Cir.2005). "No one factor, taken individually, is necessarily dispositive[;]" *FMC Corp.,* 3 F.3d at 427, "the ab-

9. It should be noted that Hornblower also submitted materials, attached to its briefs as exhibits, that purport to refute or supplant the supplemented material that plaintiff proffered and that either was or was not allowed to supplement the administrative record. These materials have been reviewed, but are not part of the administrative record, and are therefore not properly before the court as a basis for decision. *See* RCFC 56.1(a). The court places no reliance on these materials.

sence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial," *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed.Cir.1990).

## II. *Success on the merits*

In order to demonstrate success on the merits, plaintiff must prove that the Park Service acted without rational basis or in violation of an applicable procurement regulation when it selected Hornblower. Furthermore, plaintiff must show that it was prejudiced by this agency action.

Plaintiff charges that the Park Service's scoring and selection of Hornblower's proposal lacked a rational basis. "The fact that many critical elements of the proposal submitted by Hornblower Yachts, Inc. (HB) were never fully examined by the evaluation panel or that inconsistencies and deficiencies within that proposal were never adequately explained in the evaluation panel summary upon which the deciding official relied clearly demonstrates a lack of reason or coherence." Pl.'s Br. filed Jan. 3, 2006, at 2. Plaintiff then proceeds to dispute point by point the scoring by the Park Service panel.

The court agrees with defendant that plaintiff's complaint is "a classic example of a protestor throwing 'everything and the kitchen sink' into the mix . . . ." Def.'s Br. filed Jan. 12, 2006, at 1. Plaintiff's abundant, penetrating, and fulsome charges ultimately amount to simple second-guessing of the Park Service's discretion in selecting a contractor. This is an oversight role that the court is not permitted to discharge, although the court has measured every discrepancy alleged against the requirements of the prospectus. *See Impresa*, 238 F.3d at 1332. The touchstone is not whether the court would have made a different decision than the panel about which contender is the most qualified concessioner for Alcatraz, but, rather, whether the panel had a rational basis for

the decision it did make. *CCL Serv.*, 48 Fed.Cl. at 120. The [* * *] Panel Evaluation Summary, and the related documents in the administrative record, demonstrate amply that the panel had rational reasons for its scoring and selection.[10]

### 1. *Material misrepresentations in the Hornblower proposal*

Plaintiff contends that the Hornblower proposal contained [* * *] material misrepresentations that misled the evaluation panel and that principles of law and fairness thus dictate the Hornblower proposal must be disqualified. These alleged misrepresentations relate to the dates by when Hornblower's fleet would be [* * *] and its [* * *] facilities completed.

■■■ To establish a material misrepresentation, plaintiff must demonstrate that (1) Hornblower made a false statement; and (2) the Park Service relied on that false statement in selecting Hornblower's proposal for the contract award. *See CCL Serv.*, 48 Fed. Cl. at 121. To preserve the integrity of the solicitation process when such a material misrepresentation influences the award of the proposal, the proposal is disqualified from consideration. *Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed.Cir.1992).

### 1) *Date for [* * *] the vessels*

Plaintiff contends that Hornblower made a material misrepresentation regarding the date by which it would [* * *]. Principal Selection Factor 1, Subfactor C of the Prospectus set out the Park Service's "interest[ ] in protecting air quality within the park and on the routes to the park utilizing alternative energy technologies" and stated that one of the goals of the Park Service is to "reduce air pollutants emitted from services and operations provided under the concession contract." AR 7600. Specifically, the proposal asked offerors to "[d]emonstrate how you will meet the EPA emission standards that will

---

10. While all of plaintiff's arguments regarding the irrationality of the panel's scoring have been considered, the "kitchen sink" approach favored by plaintiff makes it unwise to discuss each one. Full consideration of plaintiff's arguments should not encourage litigants to retry the entire evaluation process, an indulgence that plaintiff insists is its right. Any arguments not herein discussed were determined to be both minor and without merit.

be in effect during the term of the draft Contract, including without limitation the EPA 2007 Tier II Standards...." *Id.* As part of its response to this subfactor, Hornblower represented in its proposal that [* * *]. AR 98.

Plaintiff characterizes this statement by Hornblower as a material misrepresentation. The Park Service estimated in its proposal that the start date of the contract would be approximately November 2005. Because Hornblower promised to [* * *] by the [* * *] AR 98, and the [* * *] was anticipated to be November 2005, plaintiff contends Hornblower effectively had promised the Park Service that it would [* * *] by November 2005. However, Hornblower admits that it has not yet [* * *] as of the date of argument, February 14, 2006.

Defendant presciently points out that Hornblower never stated that it would [* * *] by November 2005. Rather, Hornblower represented that it would [* * *] AR 98. The contract had not commenced by November 2005. Obviously, it still has not commenced. Furthermore, Hornblower had the foresight to anticipate possible delays and reserve its rights in the event of delay. Hornblower's proposal states that [* * *]. AR 738.

The Park Service panel, in its summaries, made inconsistent references to the date upon which Hornblower would [* * *]. First, the panel stated that, [* * *]. AR 8388 (emphasis added); *see also* AR 8458 (same language). However, the panel also stated that [* * *] AR 8452 (emphasis added). In addition, the Evaluation Summary quotes Hornblower's proposal as stating that, [* * *] AR 8450 (emphasis added). None of the three parties has succeeded in supplying linguistic gymnastics capable of reconciling these inconsistent statements.

The court finds, first, that Hornblower did not make a false statement regarding the date by which it would [* * *]. Plaintiff does not cite to anything in the administrative record to indicate that Hornblower promised to [* * *] by November 2005. It would

make little sense for Hornblower to make such a commitment, when no proposer knew the date on which the contract would commence. In fact, Hornblower specifically anticipated possible delays in the start of the contract, *see* AR 738, and stated that it would adjust its dates accordingly.[11]

Furthermore, even assuming, *arguendo,* that Hornblower made an inaccurate statement, the record does not support a finding that the panel relied on it in awarding the contract. The panel made inconsistent statements regarding when Hornblower would [* * *]. However, the fact that the panel stated that Hornblower would [* * *] appears to be an error of the panel. Nowhere in its proposal does Hornblower contend that it will finish the [* * *]; even plaintiff does not contend that Hornblower made such a representation. Instead, two of the three statements of the panel are more accurate in that Hornblower represented that it would [* * *] by the start of performance.

The most that can be drawn conclusively from the record is that the panel was unsure of Hornblower's [* * *] date. In any event, the burden of proof is plaintiff's, and its conflicting record citations do not show that the panel relied on the panel's own incorrect understanding of what Hornblower represented. Therefore, because Hornblower did not make a false statement, and nothing suggests that the panel would have relied on such a false statement, no material misrepresentation was made. *See CCL Service,* 48 Fed.Cl. at 121.

### 2) *Purchase date of the [* * *]*

Plaintiff alleges that Hornblower materially misrepresented the date upon which it [* * *]. In the appendices of its voluminous proposal, Hornblower included a Transition Plan. *See* AR 738–65. Hornblower represented in its proposal for its [* * *] vessels that it [* * *]. AR 739. Plaintiff points out that Hornblower, in fact, had not [* * *] by the date of the proposal.

---

11. The panel's inconsistent statements regarding the timing of Hornblower's [* * *]are not relevant to whether Hornblower made a false state- ment in its proposal, but bear on whether the panel relied on such a statement.

Hornblower admits that it had not [* * *] by the date of the proposal and agrees that the proposal should have been worded differently. However, Hornblower contends that it viewed the [* * *] as an ongoing process and that this view is reflected in the proposal.[12] On the next page of its proposal, Hornblower set out a Transition Plan for various aspects of its proposal, in which it allocated [* * *] days for the [* * *]. *See* AR 740.

The court finds that Hornblower's statement that it already had [* * *] at the time the proposal was submitted was a misrepresentation.

The overwhelming record evidence, however, supports a finding that the panel did not rely on this misrepresentation in making its scoring decisions. Hornblower makes conflicting statements in the proposal regarding when it will have [* * *] *Compare* AR 739 [* * *] *with* AR 740 [* * *]. While the panel theoretically might have viewed [* * *] as an increased commitment to air quality, the panel concentrated on Hornblower's promise to have [* * *] by the start of the contract. *See* AR 8450 (quoting Hornblower's statement that [* * *]), AR 8452 (stating that [* * *]). So long as Hornblower was committed to [* * *] prior to the actual commencement of the contract, the panel was assured that the pollutants generated by the [* * *] would be limited and the environmental purposes of the proposal achieved.

Most importantly, plaintiff does not cite to any document in the administrative record that reflects the panel's reliance on the [* * *]. Indeed, at oral argument, plaintiff's counsel represented to the court his belief that

the panel did not even look at the Transition Plan because of its supposed nonsensical nature-the same plan that [* * *]. It is unlikely that the panel would rely on one inconsistent statement buried in the appendices of a [* * *]-page proposal in making its decision, when Hornblower's projected schedule for [* * *] in its Transition Plan (AR 740) was so explicit. Therefore, while a false statement was made regarding the [* * *], no evidence indicates that the panel relied on the false statement, and so no material misrepresentation can be substantiated. *See CCL Service,* 48 Fed.Cl. at 121.

### 3) *Construction date of the [* * *] facilities*

Finally, plaintiff contends that Hornblower misrepresented when its [* * *] facilities would be completed and what permits it possessed. First, in its reply to Principal Selection Factor 1, Subfactor C [13] of the prospectus regarding EPA emission standards, Hornblower stated that

[* * *]

AR 99. Furthermore, Hornblower represented that, in reference to its proposed [* * *] AR 11. Hornblower also represented that [* * *] AR 9.

Plaintiff argues that these statements constitute material misrepresentations. Plaintiff points out that, while Hornblower holds a lease on the appropriate pier, it does not yet have the appropriate permits to build the [* * *] facilities, and certainly did not have them at the time of the proposal. Furthermore, plaintiff once again argues that [* * *]

---

12. Hornblower also submitted a declaration by its President, stating that at the time of the submission of the proposal, Hornblower had [* * *]. Declaration of Terry MacRae, Jan. 11, 2006, ¶¶ 5–6. Plaintiff attacks this affidavit as "self-serving[.]" Pl.'s Br. filed Feb. 3, 2006, at 2.

This declaration joins the welter of non-administrative record materials that plaintiff and Hornblower have submitted to attack and bolster, respectively, the proposers' submissions. As stated above, the court will not rely on it as a basis for decision.

13. While plaintiff references Hornblower's statements in response to the Principal Selection Factor 1, Subfactor C information on emissions, most of Hornblower's statements on its [* * *]

facilities were contained in response to Principal Selection Factor 2, Subfactor B. This subfactor reads, in part:

> The [Park Service] recognizes that park visitors may have to wait to buy tickets and board vessels, and spend time in transit to and from the island. The National Park Service desires a concessioner who will utilize these items and places to the maximum extent possible to increase visitor appreciation and understanding of the resource. The ... departure facilities ... should be used as a gateway to Alcatraz Island,... incorporating the uniqueness of Alcatraz .... What specifically will you do during these times and with your available space to achieve these goals?
> AR 7602.

AR 99, was intended to mean available by November 2005. However, in the alternative, plaintiff contends that the facilities will not be ready by the date of contract award or even by the start of contract performance.

Hornblower admits that the facilities will not be completed by the time the contract commences, but insists that the proposal never indicated that they would be. The Transition Plan in Hornblower's proposal stated that [* * *] site would take [* * *]. AR 740. In addition, the proposal states that [* * *] AR 738. Hornblower points out that some part of the work involved in constructing a new facility is encapsulated in the conceptualization and drawing of architectural plans, portions of which, drawn by the architectural firm [* * *], are included in the proposal. AR 227–36; *see also* AR 205–06 (describing Hornblower's retention of [* * *] to begin the planning of [* * *] and its related services).

The court finds no false statements, no reliance by the panel, and therefore no material misrepresentation. The statements plaintiff cites to are themselves somewhat ambiguous, but, when Hornblower's proposal is read as a whole it, is evident that it would not lead the Park Service to assume that its [* * *] would be constructed fully by the date of contract commencement. The Transition Plan shows the amount of time that will be needed to construct the facilities and obtain permits. In addition, the Hornblower statements cited by plaintiff are not as explicit as plaintiff would wish. Hornblower's statement that it had enclosed a copy of its lease agreement for the Pier 33 area [* * *] AR 99, is not a promise that it would have its full [* * *] facilities completed by that date. Rather, this is a promise that the offeror would have a location from which to launch its vessels at the start of the contract, an accurate statement. The statement that [* * *] AR 9, might have been a false statement if the entire proposal had not been qualified by Hornblower's statement that [* * *] AR 738.

Finally, the statement that Hornblower [* * *] AR 11, must be read in the context of Hornblower's prior statement, that it [* * *] AR 9, and Hornblower's subsequent statement that securing appropriate permits would require an additional [* * *] days, AR 740. It is obvious from the context that Hornblower meant, and the panel understood, that Hornblower held a long-term lease on Pier 33, along with certain permits for its use, and would obtain in the future the other necessary permits to build the [* * *] facility on the site. Therefore, the proposal contains no misrepresentation on this point.

Even assuming, *arguendo,* that Hornblower made a misrepresentation, the panel does not rely on it. It makes little sense that the panel would assume that the [* * *] facility would be ready at the start of the contract. The prospectus contemplated that the facilities would be newly constructed-that was part of the draw of Hornblower's proposal. *See generally* AR 8503–08. The panel, which must be allowed a modicum of common sense, must also have surmised that Hornblower would not actually construct expensive new facilities before it was awarded the contract. Perhaps that is why plaintiff has been able to cite to nothing in the administrative record that indicates the panel relied on the facilities being in place before the contract commenced. The best plaintiff offers is that the panel discussed the new [* * *] facility without explicit mention that it would not be ready at the time of commencement of the contract. *See* AR 8503–08. However, the panel may not have mentioned this simply because it was obvious, or for a variety of other reasons. The panel gave Hornblower a [* * *] on Principal Selection Factor 2, which was not a [* * *]. In any event, the burden of proving reliance by the panel lies with plaintiff. Plaintiff cites to no explicit reliance by the panel, and implicit reliance by the panel on expensive new facilities being completed by the time of the start of the contract (let alone before that time) makes little sense. Plaintiff has not met its burden of proving reliance by the panel. The court finds no material misrepresentation in Hornblower's proposal on this point and no reliance by the panel.

Overall, the court finds one misrepresentation in Hornblower's proposal-that it had [* * *] when, in fact, it had not. In view of the timetable set forth in Hornblower's Tran-

sition Plan and the other consistent statements and the absence of any references by the panel to the offending language, the court has no basis to infer reliance by the panel. The other statements cited by plaintiff do not constitute misrepresentations when the proposal is read as a whole. Therefore, Hornblower's proposal does not warrant disqualification for misrepresentations under the standard set out in *Planning Research Corp.,* 971 F.2d at 741.

### 2. *Incorrect evaluation of alternative technology vessels*

Plaintiff charges that the panel improperly credited Hornblower for the proposed use of "alternative technology vessels" in future years. These alternative vessels include [* * *]. According to plaintiff, these [* * *] vessels are hypothetical and unworkable for the Alcatraz run, and thus the credit the panel gave to Hornblower's use of them lacked a rational basis. It is this subject that sparked the extra-record testimonials from plaintiff and Hornblower.

The Park Service's prospectus touched upon alternative technology vessels in four different selection factors. First, Principal Selection Factor 1, Subfactor C, states:

> The [Park Service] is especially interested in protecting air quality within the park and on the routes to the park utilizing alternative energy technologies; therefore, it is a goal to reduce air pollutants emitted from services and operations provided under the concession contract.
>
> 1.) Demonstrate how you will meet the EPA emission standards that will be in effect during the term of the draft Contract, including without limitation the EPA 2007 Tier II Standards for marine Category I engines, as follows:
>
> . . . .
>
> b) Demonstrate how, while reducing emissions, you will also maintain:
>
> . . . .
>
> iii) An energy-efficient service for the public benefit. ("Energy-efficient" in this sentence means the total usage of energy from renewable resources versus non-renewable ones.)

AR 7600. In addition, Principal Selection Factor 2, Subfactor C, states that "[t]he National Park Service would like to know what kind of vessels you plan to use for the Alcatraz Operations, and why you believe they are best suited for this operation. Submit descriptions and specifications of the vessels you plan to use . . . ." AR 7603. Next, Secondary Selection Factor 1, Subfactor B, asks Hornblower to "[o]utline specific plans and programs that you intend to implement to encourage conservation of natural resources." AR 7621. Finally, Secondary Selection Factor 2 states:

> Additional consideration will be given in evaluation of the Offer if the Offeror is willing and able to reduce emissions beyond those required for compliance [with EPA standards]. In preparing a response . . ., the Offeror should review the goals identified by the San Francisco Bay Area Water Transit Authority . . . .
>
> . . . How will you reduce emissions beyond those required [by EPA standards]? Your answer should clearly explain how your proposal is: Technically feasible[,] Environmentally responsible[, and] Economically practical[.]
>
> Give exact dates and plans for accomplishing your proposal. Describe what protocols you will use to measure and test your emissions, how often each emission will be tested, and by whom.

AR 7622.

In the first of [* * *] alternative fuel vessels, Hornblower proposed the [* * *] as a future ferry vessel to be used in trips to and from Alcatraz Island. The [* * *] that runs mainly off of [* * *], supplemented by [* * *]. Hornblower proposed [* * *]. The vessel would be custom-designed for the Alcatraz contract and is described in the proposal alternatively as [* * *]. *Compare* AR 157 [* * *] *with* 247 [* * *]. This technology is in operation and currently [* * *].

Hornblower also proposed the use of a [* * *] has yet been built, but Hornblower included in its proposal an [* * *]-page document, created in conjunction with the [* * *], describing the proposed vessel. AR 1494–1580. Hornblower stated its tentative

plan to use this smaller vessel to [* * *]. AR 255.

The panel [* * *] Hornblower under [* * *] of the above-mentioned factors for its proposed use of these alternative fuel vehicles. Under Principal Selection Factor 1, the panel found that Hornblower [* * *] AR 8453. Under Principal Selection Factor 2, the panel opined that Hornblower's proposal [* * *] AR 8494. Under Secondary Selection Factor 1, the panel stated that Hornblower [* * *] AR 8528. And under Secondary Selection Factor 2, the panel expressed its opinion that Hornblower [* * *] AR 8511. The Briefing Statement that accompanied the Panel Evaluation Summary viewed the alternative vessels, particularly the [* * *], as a [* * *] in Hornblower's proposal. AR 8599.

Plaintiff insists that the Park Service "had no reasonable basis [* * *] in any evaluation factors for proposing to deploy either futuristic alternative fuel vessel." Pl.'s Br. filed Jan. 3, 2006, at 9. Plaintiff attacks both alternative fuel vessels as too speculative to be given any credit. In addition, plaintiff disputes that Hornblower could use the [* * *], as planned for [* * *]. Therefore, plaintiff reasons that the [* * *] would not be a proper ferry and contends that giving Hornblower any credit for it in the list factors was irrational.

Plaintiff singles out the [* * *] as particularly unworthy and undesirable. In addition to being unreliable, plaintiff argues that they will not work as ferry boats to Alcatraz Island. The [* * *], in plaintiff's view, would cause a whole host of problems. The wind would knock the vessel about, and the current would sweep the ship off course. This is not even to mention the increased sea-sickness of the passengers. The treacherous currents and unpredictable, strong winds surrounding Alcatraz require something more stable and with more "oompf" than is provided by the [* * *], claims plaintiff. Deep-vee hulls, low wind profiles, rugged steel designs, and high horsepower engines are all required to successfully and reliably navigate the San Francisco Bay around Alcatraz.

If the [* * *] were to work at all, plaintiff contends that Hornblower must operate its [* * *] constantly (except during loading). This would increase the amount of emissions produced by the vessels and so negate their low-emission benefits. In addition, unlike [* * *], plaintiff alleges that the [* * *] cannot obtain [* * *] to operate in the tenebrous San Francisco Bay.

Defendant upholds the rationality of the panel's credit for the [* * *]. It points out that one such vessel is already in use in [* * *]. A study by [* * *] submitted by Hornblower in its proposal, the company that designs and builds [* * *], showed that the vessel was viable. It concluded that sufficient [* * *] was available in the San Francisco Bay area to operate the vessel successfully. [* * *] also provided an analysis of the projected emissions of [* * *] vessel on the Alcatraz ferry route. Finally, [* * *] touted the advantages of the special [* * *] hulls on the [* * *] less drag, more maneuverability, and more room on the decks. The study purports to show that the [* * *] vessels could not only make the Alcatraz run successfully, but that they could do so with [* * *]less emissions. All this information was in the administrative record that was before the panel.

Defendant also points out that these [* * *] vessels had outside support. The San Francisco Board of Supervisors, through formal resolution, urged the Park Service to mandate the use of [* * *] in its ferry contracts. The Bluewater Network, a local environmental group involved in zero-emission propulsion technologies, wrote letters in support of the Hornblower [* * *]. Regarding the potential [* * *], defendant agrees that it is a more speculative technology. Significantly, the panel did not afford it much weight. The Evaluation Summary states: [* * *] AR 8520. Plaintiff also had included in its proposal the "goal" of "ultimately achieving [* * *] ferries [* * *] when possible . . . ." AR 6657.

The court agrees that the panel had a rational basis for giving Hornblower credit for these vessels under each of the four factors listed above. The prospectus emphasized the Park Service's goal of reducing

emissions in the San Francisco Bay area; the Park Service sought to reward offerors who took the lead on alternative technologies and low-emission vessels. The information that Hornblower submitted met the requirements of the prospectus. Secondary Selection Factor 2 had the highest bar, requiring Hornblower to "explain how your proposal is: Technically feasible[,] Environmentally responsible[, and] Economically practical[.]" AR 7622.[14]

The panel concluded that, while assessing the feasibility of the [* * *]was [* * *] because there were few of them currently in operation, [* * *] AR 8520. Plaintiff disagrees with this conclusion of technical feasibility, but it was reasonable based upon the inclusive record before the panel. The panel had before it a [* * *] page study by the creators of the [* * *] purporting to show that it would operate effectively in the San Francisco Bay. Plaintiff speculates, for various reasons, that the vessels might be less than ideal. However, the court cannot substitute its judgment for that of the panel. The only question before the court is whether the panel made a rational decision in concluding the [* * *] would probably perform as Hornblower advertised. A review of the materials included in the administrative record evidence a sufficient basis for the panel to make this determination.

With respect to the [* * *] vessels, the panel concluded that, despite the documentation provided by Hornblower, they were [* * *] and the [* * *] AR 8520. The panel did note that the "economic feasibility" of constructing and operating the [* * *] vessel had been demonstrated. AR 8520. Once again, the administrative record contains sufficient information to support whatever credit the panel gave the [* * *] vessel based upon this "economic feasibility," so that its determination was rational. The administrative record included an [* * *]page

Memorandum of Understanding between Hornblower and the San Francisco Bay Area Water Transit Authority regarding the potential [* * *]. AR 1494–1580. This was a sufficient predicate for the panel to conclude that the "economic feasibility" of the vessel had been demonstrated, especially considering that the panel remained skeptical of its "technical feasibility and reliability" without additional evidence. AR 8520. To decide otherwise based upon speculation by plaintiff would only be to substitute the court's judgment for that of the panel.

The panel's decision to give credit to Hornblower under [* * *] selection factors for its inclusion of the [* * *] vessels was rational based upon the record before the Park Service. Weighing the record against plaintiff's challenges involves precisely the * * * sort of "minutiae of the procurement process... which involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449.

### 3. Incorrect proposed number of round trips

Plaintiff charges that Hornblower proposed an incorrect number of daily ferry trips to and from Alcatraz Island. This error allegedly allowed Hornblower to overstate the quality of its visitor services, understate its costs and emissions, and misevaluate the franchise fee that it could offer the Park Service.

The prospectus set out, in table form, the required ferry schedule that offerors must maintain. *See* AR 7356–60. The Winter Schedule for 2005 required, daily: one staff boat, ten daytime boats, and one evening boat. AR 7356. The Spring Schedule required, daily: one staff boat, ten daytime boats, and two evening boats. AR 7357. The Summer Schedule required, daily: one

---

**14.** By contrast, the other selection factors had lower standards. Principal Selection Factor 1, Subfactor C, asked Hornblower to "demonstrate" how it would reduce emissions while maintaining energy efficiency. AR 7600. Principal Selection Factor 2, Subfactor C, states that the Park Service "would like to know" about Hornblower's vessels, and asked that "descriptions and specifications" be submitted. AR 7603. Secondary Selection Factor 1, Subfactor B, asks Hornblower to "[o]utline" its plans for conservation of resources. AR 7621. Hornblower certainly submitted sufficient information regarding the feasibility of its alternative fuel vessels for the panel to credit its plans under these three factors, as they valued forward-thinking much more than demonstrated workability.

staff boat, fourteen daytime boats, and two evening boats. AR 7358. The Fall Schedule required, daily: one staff boat, ten daytime boats, and two evening boats. AR 7359. The Winter Schedule of 2006 required, daily: one staff boat, ten daytime boats, one evening boat, and two holiday boats. AR 7360. In addition to explicitly setting out the number of boats per day, the tables also provide starting and ending departure times, with the explanation, "Scheduled every 30 minutes, maintaining the same schedule as much as possible." *See, e.g.,* AR 7356. The first boat always departs for Alcatraz at 9:30 a.m. In the winter, spring, and fall the last boat departs for Alcatraz at 2:15 p.m., while in the summer it departs at 4:15 p.m. The last boat departs Alcatraz to return to its landing site at 4:30 p.m. in the winter, spring, and fall and at 6:30 p.m. in the summer.

Hornblower proposed its number of daily round trips to the island based upon the numbers set out in the seasonal schedules. The panel, in evaluating Hornblower's proposal, wrote that it [* * *] AR 8453.

In the face of the prospectus directives, plaintiff argues that the language of the prospectus requires more round trips than have been set out as the required number. While the prospectus states that the offeror is required to host eleven daytime boats per day in the winter, spring, and fall (ten daytime boats plus one staff boat), plaintiff argues that, to send a boat every half hour starting at 9:30 a.m. and continuing until 2:15 p.m., the required number is actually fourteen. Similarly, in the summer, while the prospectus sets out fifteen daytime round trips as the required number, eighteen are required. Where the prospectus sets out two evening trips per day, it actually mandates three. Plaintiff bolsters its reasoning with the fact that, when performing the contract in the past, plaintiff itself had provided these in-creased trip numbers for visitors, and the Park Service has found them to be correct.

Instead of proposing these larger number of daily trips, plaintiff criticizes Hornblower for proposing the lower numbers set out in the prospectus-*i.e.,* [* * *] instead of [* * *] instead of [* * *], [* * *] instead of [* * *]. Therefore, Hornblower understated the required number of trips by roughly [* * *]. This "mistake" trickles down through Hornblower's proposal. Hornblower should have [* * *] more trips, and therefore [* * *] greater emissions under Principal Selection Factor 1; higher costs under Principal Selection Factor 4; a lower franchise fee under Principal Selection Factor 5; or, at the least, inferior visitor services under Principal Selection Factor 2. Plaintiff suggests that the Park Service's "failure to recognize that [Hornblower] proposed too few round trips ... [proves that the Park Service's] evaluation of [Hornblower]'s proposal and selection of [Hornblower] for contract award lacks a rational basis." Pl.'s Br. filed Jan. 3, 2006, at 16.[15]

Hornblower rejoins that plaintiff does not dispute that Hornblower's proposed round trips were the same as the scheduled trips called for in the prospectus. Thus, plaintiff is objecting that the prospectus was ambiguous or was inaccurate. In either case, however, plaintiff should have requested a clarification from the Park Service prior to the submission of proposals, rules for which were set out in the prospectus itself. *See* AR 7575–76, 7578. Instead of asking for a clarification pre-proposal, plaintiff waited until it had lost the award. Moreover, plaintiff did not propose this supposedly "correct" number of trips-in fact, all three offerors proposed different numbers of trips, none of which comport with plaintiff's touted required number.[16]

---

**15.** After it was revealed that plaintiff also failed to propose the correct number of trips and that the Park Service had also "failed to recognize" that fact, plaintiff changed its proposed solution. Instead of declaring the Park Service's decision irrational on this basis, plaintiff states that the panel should have "normalized" the number of round trips between the three proposers. Pl.'s Br. filed Jan. 31, 2006, at 13. Presumably, the court, by now besotted with the technica of plaintiff's complaints, would send the decision back to the panel for this normalization and re-scoring.

**16.** Plaintiff admits to this, stating that it excluded the evening trips from its proposal inadvertently. Pl.'s Br. filed Jan. 31, 2006, at 13.

The court finds that the panel had a rational basis for deciding that Hornblower proposed a [* * *] AR 8453. Hornblower proposed precisely the number of trips called for in the schedules. Plaintiff may be correct that the schedules are ambiguous when one compares a time table with the number of trips listed per day. However, if plaintiff sought to clarify this inaccuracy or ambiguity in the schedules, the prospectus set out rules for how plaintiff was to do so. The prospectus included detailed Proposal Instructions that directed any offerors who believed "any statement in the Prospectus to be inaccurate [to] ... submit comments to the National Park Service in writing, no later than thirty days prior to the due date for proposals." AR 7578. The prospectus also stated that, "[i]f you do not understand something in this Prospectus, you must submit your questions in writing to [the Park Service] ... no later than 4:00 p.m. on Friday, February 11, 2005.... The National Park Service will respond to your question in writing, and will provide the question and response to all potential Offerors ...." AR 7575–76. Plaintiff did not ask the Park Service for clarification regarding the schedule, and the court agrees that it is too late to assert the ambiguity. *See Novell, Inc. v. United States,* 46 Fed.Cl. 601, 615 (2000) (stating that "[o]fferors may challenge the terms of the solicitation, but only prior to submission of final proposals").

Therefore, the court limits its decision to whether the panel made a rational decision when it credited Hornblower for proposing the number of round trips set out in the schedule. This decision was rational. The fact that plaintiff admits that it failed to propose the supposedly correct number of round trips leaves plaintiff little cause to complain.

4. *Misevaluation of principal selection factors*

1) *Misevaluation of Principal Selection Factor 1*

Principal Selection Factor 1 relates to "[t]he responsiveness of the proposal to the objectives, as described in the prospectus, of protecting, conserving, and preserving resources of the park area[.]" AR 7576.

Plaintiff argues that the Park Service misevaluated Hornblower's proposal because Hornblower (1) made the material misrepresentation that its vessels would be [* * *]; (2) proposed an incorrect number of round trips, understating the amount by [* * *] (3) proposed to use engines that fail to meet [* * *]; (4) did not submit emissions data for Hornblower's proposed backup vessels for the panel to evaluate; and (5) the Park Service misevaluated the parties' relative historic preservation experience (particularly on the question of nesting birds). Pl.'s Br. filed Jan. 3, 2006, at 16, 21.

Of these five issues, the first three previously have been dealt with and resolved against plaintiff. Hornblower made no material misrepresentation regarding the date by which its [* * *] because the "start of the contract" was a floating date, rather than fixed at November 2005. Furthermore, the [* * *], but Hornblower does not propose to make use of those [* * *], so the point is irrelevant. Also, while plaintiff contends that Hornblower understated its round trips by [* * *] Hornblower submitted a proposal consistent with the number of round trips listed in the prospectus. Plaintiff objects too late and misstated its own round-trips, as well.

Only two allegations remain. First, plaintiff contends that the panel's evaluation of Principal Selection Factor 1 lacked a rational basis because the panel was not afforded the opportunity to evaluate emissions data for Hornblower's backup vehicles. The relevant guidelines of Principal Selection Factor 1 ask that offerors "[r]eport the current levels of emissions for each existing vessel that you propose to use in the Alcatraz operation." AR 7601. Hornblower provided data for its [* * *] Initial Service Vessels, but did not provide data for its backup vessels. The backup vessels, it should be noted, were proposed to be used only in the event of [* * *]. AR 240.

Hornblower does not dispute the point, but defendant contends that, even so, the panel had a rational basis for not evaluating the emissions of the backup vessels. They were, presumably, a small portion of the total emis-

sions because the vessels would be used so rarely. Defendant also argues, and plaintiff does not deny, that plaintiff also did not provide any emissions data for its backup vessels. The panel may have viewed the lack of backup vessel emissions data as an immaterial omission from both plaintiff and Hornblower's proposals.

The court will not base a finding on speculation or find the decision irrational based on this deficiency shared by plaintiff and Hornblower. The panel could have rationally scored both plaintiff and Hornblower on Principal Selection Factor 1 without reference to the Subfactor C data relating to the emissions of the backup vessels. The backup vessels account for a small part of the total emissions evaluated under Subfactor C, and Subfactor C is not separately scored, but is only one part of Principal Selection Factor 1. For the panel not to comment on this subset of missing data does not render the panel's decision irrational or unreasonable.

Next, plaintiff puts forward that the panel misevaluated the parties' relative experience with historical preservation; in particular, plaintiff deems itself a better guardian of the island's nesting bird population. Hornblower, according to plaintiff, would drive noisy boats by the birds' homes, and in an even more demonstrable insensitivity, install [* * *] near the nesting seabirds. Pl.'s Br. filed Jan. 3, 2006, at 22. The panel's failure to account for this disturbance, plaintiff maintains, was irrational.

Primary Selection Factor 1, Subfactor B, asked offerors to "[p]rovide a specific plan for minimizing the impact of the operation and maintenance of the assigned Concession facilities and equipment on the bird nesting populations on the island." AR 7599. When commenting on Hornblower's response to this subfactor, the panel stated that

[* * *]

AR 8457. Specifically regarding nesting birds, the panel concluded:

[* * *]

AR 8433–34.

The administrative record reveals that the panel had a rational basis for its finding that Hornblower's proposal demonstrated an understanding of the Park Service's native fowl. The panel's statements, as reflecting Hornblower's proposal, speak for themselves on the matter. The panel did not misevaluate Principal Selection Factor 1.

2) *Misevaluation of Principal Selection Factor 2*

Principal Selection Factor 2 relates to "[t]he responsiveness of the proposal to the objectives, as described in the prospectus, of providing necessary and appropriate visitor services at reasonable rates[.]" AR 7576. According to plaintiff, the Park Service misevaluated the Hornblower proposal by failing to consider and downgrade it on several points: (1) Hornblower proposed [* * *]fewer than the required number of round trips; (2) Hornblower provided no data on its backup vessels; (3) Hornblower's boats currently are using [* * *] that are too weak; (4) the [* * *] facilities will not be completed by the start of the contract; (5) Hornblower proposed inadequate backup vessels; (6) the new departure location, [* * *], is [* * *] farther from Alcatraz Island than plaintiff's facility; (7) cruise ships will interfere with Hornblower's ferries; (8) Hornblower's lease requires that it allow vehicular traffic access to its pier; (9) sufficient parking is not available at the new location; and (10) the new location is not adjacent to the shopping area at Fisherman's Wharf.

Plaintiff's argumentation suffers no embarrassment of under-embellishment. As Hornblower argues, "Someone reading [plaintiff]'s litany of deficiencies for the first time might presume the prospectus actually contained any of these specific requirements. Even a casual perusal of the prospectus, however, demonstrates that [plaintiff], once again, is creating prospectus requirements out of whole cloth." Hornblower's Br. filed Jan. 18, 2006, at 29. The court, unfortunately, is required to do more than casually peruse; therefore, the requirements of Principal Selection Factor 2 are quoted at length:

*Subfactor B2(a)*

Tell us your plan for marketing and managing ticket allocation and sales for the Alcatraz operation, clearly explaining how all aspects of the program will operate

to assure efficiency, equity, and consistency. Your response should include:

1) How tickets will be marketed and sold . . . .

2) How you will manage the group reservation program. . . .

*Subfactor B2(b)*

The [Park Service] recognizes that park visitors may have to wait to buy tickets and board vessels, and spend time in transit to and from the island. The National Park Service desires a concessioner who will utilize these times and places to the maximum extent possible to increase visitor appreciation and understanding of the resource. . . . What specifically will you do during these times and with your available space to achieve these goals?

*Subfactor B2(c)*

The National Park Service would like to know what kind of vessels you plan to use for the Alcatraz Operations, and why you believe they are best suited for this operation.

AR 7602–03.

The first four of plaintiff's ten complaints are merely repetition of prior arguments and may be dealt with summarily: (1) Hornblower proposed the number of trips required by the prospectus; (2) neither plaintiff nor Hornblower provided data on backup vessels; (3) Hornblower plans to [* * *] (by which it refers to the actual start of the contract, not the supposed start date of November 2005); and (4) Hornblower was clear, and the panel anyway would have presumed, that the new, [* * *] facilities would not be completed before commencement of the contract.

Plaintiff takes Hornblower's proposed backup vessels to task as inadequate in number and size. Hornblower's proposal, however, does not substantiate plaintiff's contention. Hornblower stated:

[* * *]

AR 257. Based upon these representations, the panel concluded that Hornblower [* * *] AR 8495. Hornblower's representations provided a rational basis for the panel's finding, and the court will not disturb it.

Plaintiff deems the panel's decision irrational because it fails to account for the fact that the new departure location, [* * *], is [* * *] farther from Alcatraz Island than plaintiff's facility. Unfortunately for plaintiff, distance from Alcatraz Island was not a subfactor of the prospectus. Instead, the prospectus said that it was not the length of the offeror's trip that is important, but, rather, how the offeror intended to use it. *See* AR 7602 (recognizing "park visitors may have to . . . spend time in transit to and from the island[,]" and asking how the concessioner "will utilize [this] time" to "increase visitor appreciation and understanding of [Alcatraz Island]"). Hornblower responded with [* * *], a proposal that the panel favorably considered. *See* AR 8503, 8504, 8506. Plaintiff has offered insufficient grounds to denigrate the finding as irrational.

Plaintiff next observes that cruise ships will interfere with Hornblower's ferries. However, defendant points out, and the court agrees, that plaintiff does not provide sufficient evidence that the cruise ship departures or arrivals affect Hornblower's ferry schedule. The ships pass across plaintiff's ferry path, as well, and plaintiff does not give the panel information to allow a determination that Hornblower would be impacted much more than plaintiff. Even assuming, *arguendo*, that all of plaintiff's complaints have merit, the interference of cruise ships does not prevent Hornblower from providing ferry services. Again, the panel apparently found longer shuttle times, mitigated by Hornblower's [* * *], to be an acceptable tradeoff when weighed against the other advantages offered by Hornblower. This is a rational finding by the panel, and the court will not disturb it.

Hornblower's lease apparently requires that it allow vehicular traffic access to its pier, which counsel explained during argument, was for trash disposal. Hornblower counters that, even if true, the current design, as represented at AR 227 and AR 234, allows room for vehicular access. Plaintiff invites the court to analyze the preliminary architectural drawings to decipher whether a trash truck would have sufficient access to retrieve and dispose of containers. It almost

goes without saying that the panel's findings are not rendered irrational for failing to examine the details of Hornblower's garbage disposal.

More substantial is plaintiff's contention that the proposed [* * *] facility will have insufficient parking space for the ferry public. Once again, it should first be noted that parking concerns were not included among the subfactors in the prospectus. Defense counsel opined during oral argument that this was probably due to the conscious decision of the environmentally friendly Park Service, which wished to encourage mass transportation, such as busing or cable car use. Indeed, Hornblower emphasized [* * *] in its proposal, stating that [* * *]AR 17. Hornblower's proposal states (although plaintiff disputes) that [* * *]. However, even assuming that this number is illusory, the proposed new [* * *] facility is located less than one-half mile from plaintiff's current facilities. Therefore, any parking available to plaintiff would probably be within reasonable walking distance of [* * *].

The back-and-forth regarding the local parking situation is interesting, but the panel did not emphasize parking; it was not a subfactor or referred to it in the panel's evaluation of the proposals. Plaintiff would have the court find this omission to be irrational, and indeed, that the average American in 2006 might be required to walk one-half mile from his car to any destination might be viewed as an irrational proposition. However, that does not mean that the panel was irrational to emphasize features other than parking. Hornblower provided sufficient details regarding the accessability of its [* * *] facilities for the panel to have a rational basis for scoring Hornblower's proposal high on Principal Selection Factor 2's visitor services criteria.

Finally, plaintiff complains that Hornblower's proposed facility is not adjacent to tourist attractions, shops, or restaurants. Once again, the prospectus does not mention proximity to such amenities as a criterion. The new [* * *] facility is less than one-half mile from the Fisherman's Wharf area to which plaintiff so proudly proclaims itself adjacent, and while envisioning the American public as

willing to perambulate may be farfetched, it is within the Park Service's discretion not to issue a more realistic prospectus. To declare the panel's evaluation irrational for its failure to consider as a negative the necessity to walk to various restaurants is not a proper function of judicial review.

3) *Misevaluation of Principal Selection Factor 3*

Principal Selection Factor 3 relates to "[t]he experience and related background of the Offeror, including the past performance and expertise of the Offeror in providing the same or similar visitor services as those to be provided under the concession contract." AR 7576. As one of three subfactors, Subfactor B, the prospectus asked the offeror to

[g]ive specific examples of business operations undertaken by the Offeror that demonstrate [experience managing the required and authorized services required in this prospectus]. Identify any experience you have in providing services under contract for a federal, state, or city agency, large corporation, or other organization with significant philosophical and operational constraints and/or goals. Discuss how you will approach operating within a unit of the National Park System and your understanding of the specifics of operating within Golden Gate National Recreation Area.

Provide an example of how you have managed operations similar to those identified in the draft Contract where you have marketed and managed ticket allocations/sales to a diverse public.

AR 7606. Focusing on the portion of the subfactor that relates to experience "providing services under contract for a federal, state, or city agency, large corporation or other organization with significant philosophical and operational constraints and/or goals[,]" AR 7606, plaintiff declares that the panel lacked a rational basis to score Hornblower [* * *] on the Principal Selection Factor 3, because plaintiff, as the incumbent contractor, obviously had more experience in providing these services.

Indeed, plaintiff cites agreement of the panel on this point, as the members state in

their evaluation that plaintiff has [* * *] and that [* * *] AR 8587. By contrast, the panel commented that Hornblower has [* * *] AR 8587. The panel extols Hornblower's experience in providing group charters, dining, and harbor cruises to the private sector, but notes that Hornblower [* * *] AR 8587. In addition, Hornblower had only one contract with a federal, state, or city agency, which [* * *] AR 8471. Based upon these statements, plaintiff asserts that there could be no rational conclusion other than to rank plaintiff higher than Hornblower on Principal Selection Factor 3.

Plaintiff embraces too narrow a view of Principal Selection Factor 3. Plaintiff concentrates on one part of one subpart of the selection factor and leaves out many of the panel's other statements regarding Hornblower. For example, the panel observed that Hornblower

[* * *].

AR 8471. The panel also noted that, while Hornblower had little experience with government contracts, it had [* * *] AR 8471.

The panel apparently concluded that Hornblower's [* * *] answers and [* * *] in certain areas not involving ferry contracts with government entities compensated for plaintiff's greater experience in providing appropriate ferry services. Plaintiff's selective citations to the record do not prove otherwise. Plaintiff offers as self-evident the proposition that an experienced ferry operator should be scored higher than an neophyte, so that the panel was irrational in ranking [* * *] plaintiff and Hornblower's general experience in the types of concession activities required by the contract.[17] This showing does not meet plaintiff's burden, and the court will not declare the panel's actions irrational.

4) *Misevaluation of Principal Selection Factors 4 & 5*

Principal Selection Factor 4 relates to "[t]he financial capability of the Offeror to carry out its proposal[.]" AR 7574. Princi-

pal Selection Factor 5 relates to "[t]he amount of the proposed minimum franchise fee, if any, and/or other forms of financial consideration to the Director." AR 7575. In general, plaintiff alleges that the misevaluation of Principal Selection Factor 4 allowed Hornblower to propose, and the panel to view as rational, Hornblower's higher franchise fee in Principal Selection Factor 5.

Plaintiff makes three broad attacks on the panel's evaluation of Principal Selection Factor 4. First, plaintiff cites the failure of Hornblower to propose wages consistent with the Service Contract Act, 41 U.S.C. §§ 351 (2000), thereby allowing it to understate its costs. However, because this argument implicates an explicit, and allegedly unmet, requirement of federal law, it amounts to an attack on the lawfulness of the Park Service selection process and is addressed separately below. Second, the panel's decision lacked a rational basis because it scored Hornblower [* * *] on Principal Selection Factor 4 even though Hornblower, in contravention of the prospectus, provided the panel only with audited financial data, not audited financial statements. Plaintiff's other concerns involve Hornblower's alleged understatement of costs and overstatement of projected revenue, which, because they were not discovered by the panel, allegedly caused the panel irrationally to declare Hornblower's proposal to be financially viable.

Principal Selection Factor 4 of the prospectus required that the offeror describe its financial capability, as follows:

*Subfactor B4(a)*

Demonstrate that you are financially sound and have a history of meeting your financial obligations by providing the following:

1. Audited financial statements for the two most recent fiscal years. Financial statements should be provided for the offeror *and* all parent companies....

---

17. It should perhaps be noted that too much emphasis in the selection process on the incumbent's greater experience in performing the services required under a contract might run afoul of Congress' intent to eliminate any advantage to

the incumbent contractor and ensure true competitive bidding. *See* The National Park Service Concessions Management Improvement Act of 1998, 16 U.S.C. § 5952 (2000).

2. A *current* credit report (within the last six months) from a major credit reporting company. . . .

*Subfactor B4(b)*

Provide the Offeror's estimate of the acquisition and start-up costs of this business. . . .

*Subfactor B4(c)*

Identify the source(s) of the funds estimated above. Provide compelling documentation of your ability to obtain the funds from these sources. Explain fully the financial arrangements you propose to use. . . .

*Subfactor B4(d)*

Demonstrate that your proposal is financially viable. . . . provide projected estimates of the revenues and expenses of the concession business. . . .

Fully explain the method of preparing the estimates and the assumptions on which your projections are based. Information must be sufficiently detailed to allow a reviewer to determine the basis for the estimates and make a determination of whether or not the projections are realistic.

AR 7611–12. Principal Selection Factor 5 asks the offeror to

[s]tate the Franchise fee that you propose. Such fee must be at least equal to the minimum franchise fee [of 21.5% of gross annual receipts] . . . . The franchise fee you propose must be supported by the financial estimates under [Principal Selection Factor 4, Subfactor] d. If your projected revenue and expense estimates are found to be unreasonable, it may reflect on scoring.

AR 7620.

I) *Audited financial statements*

Principal Selection Factor 4, Subfactor A, required that the offeror provide "[a]udited financial statements for the two most recent fiscal years." AR 7611. It is undisputed that Hornblower did not provide these audited financial statements. Hornblower's proposal stated that [* * *] AR 580.[18] Hornblower also explains in the proposal that at SFB4(a)–1a and SFB4(a)–2a it has provided [* * *] AR 580–81. However, while the internally prepared Consolidated Financial Statements are present, AR 603–04, 606–08, the audited financial statements by [* * *] were not provided. *See* AR 602 (cover page for an empty section that identifies its contents as [* * *]audited financial statements), AR 606 (cover page for an empty section identifies its contents as [* * *] audited financial statements).

The evaluation reflects that the panel took note of this deficiency:

[* * *]

[* * *]

[* * *].

AR 8581. The panel attributed the omission of the statements to a [* * *] AR 8578, finding that [* * *] AR 8578. The panel stated:

[* * *]

AR 8578.

Plaintiff deems this conclusion to be irrational. Defendant responds that Hornblower provided audited financial data, credit reports, and other indicators of financial reliability that, taken together, were more than sufficient to supply a rational basis for the panel's conclusion that Hornblower was financially sound under Principal Selection Factor 4. Hornblower adds that, if the formal provision of audited financial statements was a strict requirement, plaintiff also did not provide all of the audited financial statements required by the prospectus. Plaintiff so conceded during oral argument, but insisted that the corporate entities that it omitted were holding companies that do not have assets.

The court finds that the panel had a rational basis for determining that Hornblower was financially capable under Principal Selection Factor 4. Although Hornblower failed to

---

18. The proposal goes on to explain that Hornblower was forced to switch accountants from [* * *] when the offerors began preparing their proposal for the Alcatraz concession contract because [* * *] was a major contractor to the Park Service.

provide audited financial statements, financial data that had been audited were included. The panel recognized the significant differences in the reliability of the information provided. If the panel had been scoring Hornblower on just that portion of Subfactor B, the court would agree with plaintiff that it was irrational to give Hornblower credit.

However, the requirement that Hornblower provide audited financial statements was one part of one single subfactor under Principal Selection Factor 4. As the Proposal Instructions announce, subfactors were not separately scored, but were to be "discuss[ed] ... when applicable[,] ... [along with] other supporting quantitative information." AR 7576. The panel's task, as described in the instructions in the prospectus, was to give each selection factor a score that "reflects the determined merits of the proposal under the applicable selection factor and in comparison to the other proposals received." AR 7576. The panel [* * *] Hornblower's internal financial data, AR 8578, and found that Hornblower used a [* * *] AR 8581. This detailed information, combined with the representation on the spreadsheets that the data were audited, and other indicia of reliability, enabled the panel rationally to declare Hornblower financially capable and to give a higher score on Principal Selection Factor 4.[19] The court agrees that the other evidence before the panel was sufficient to provide a rational basis for the panel's conclusion that Hornblower was financially capable.[20]

### ii) *Overstatement and understatement of costs*

Plaintiff also attacks Hornblower's: (1) failure to include as part of its startup costs the money required to [* * *]; (2) failure to

reduce its passenger volume, and thus ticket revenue, due to the new inconvenient location of the [* * *] site and proposed construction activities; and (3) understatement of costs due to the exclusion of necessary vessel crew members and island staffers. Taking into account all projected increased costs and decreased revenues, plaintiff calculates that Hornblower's costs exceed its revenues, with the consequence that Hornblower will be unable to pay its franchise fee.

Plaintiff asserts that Hornblower excluded "more than [* * *] startup costs," Pl.'s Br. filed Jan. 3, 2006, at 31, relating to its [* * *] that should have been reported under Principal Selection Factor 4. Plaintiff reasons that, because Hornblower stated that it owned the vessels that would be [* * *], Hornblower would incur the [* * *]. Defendant responds that the vessels were [* * *], not [* * *] by Hornblower. According to Generally Accepted Accounting Principles (GAAP), capitalization of [* * *] costs was inappropriate. Hornblower adds that the costs associated with the [* * *] are reflected in the [* * *] costs, and to identify them again would be double counting. Defendant's final thought is that, even if Hornblower omitted [* * *] in costs, Hornblower had over [* * *] million in available funds to cover this amount. AR 581.

The court agrees that the costs of the [* * *] of the vessels are included in their [* * *] and should not be included separately a second time in startup costs.

Plaintiff faults Hornblower for overstating its revenues under the contract by failing to reduce the number of tourists, and thus ticket sales, that it would produce at the new [* * *]. Plaintiff views [* * *] as more difficult to access with fewer surrounding tourist

---

19. The court notes that Hornblower received a [* * *] out of five for this factor.

20. Assuming, *arguendo*, that it was irrational for the panel to credit Hornblower's financial capability in the absence of formal audited financial statements, plaintiff would not have been prejudiced. First, plaintiff also failed to perfect its proposal by providing all required audited financial statements. Plaintiff represents that these were parental holding companies without assets. However, the proposal specifically directed offerors to provide audited financial statements "for

the offeror *and* all parent companies." AR 7611 (emphasis in original). Second, even if Hornblower had been scored zero out of five on Primary Selection Factor 4 due to its failure to submit audited financial statements, it still would have received a cumulative score of [* * *], which is [* * *]. *See* AR 8403–04 (giving Hornblower a cumulative score of [* * *], including [* * *] out of [* * *] points on Principal Selection Factor 4, and plaintiff a cumulative score of [* * *], including [* * *] out of [* * *] points on Principal Selection Factor 4).

sites. Moreover, tourist interest in Alcatraz will be reduced while the [* * *] is being constructed.

Hornblower, in response, denies that the location of its facility will attract fewer visitors, calling plaintiff's assertions "self-serving[.]" Hornblower's Br. filed Jan. 18, 2006, at 42. Hornblower emphasizes that its proposal invests [* * *]. *Id.* This, as the panel took note, AR 8461, would attract more visitors to the [* * *] facility. Finally, Hornblower's new facilities will be [* * *] to plaintiff's existing site, which Hornblower predicts will increase revenue. AR 8461.

The court finds that the panel had a rational basis to assume the number of visitors would not decrease significantly when Hornblower took over the contract. While it is possible that the new location and construction might reduce the number of visitors in the short term, the new facilities and advertising would serve to attract them. This is a textbook example of when the agency-in this case the panel-has greater expertise in making a predictive judgment than the court.

Plaintiff contends that Hornblower understated its costs by omitting necessary vessel crew members and island staffers. In particular, Hornblower listed costs for [* * *]. Adding these deckhands allegedly increases Hornblower's costs by [* * *] per year (presumably in Service Contract Act appropriate wages).

Hornblower responds, first, that plaintiff is inaccurate-Hornblower [* * *][21] Hornblower points out that Coast Guard regulations only require the [* * *] respectively. *See* AR 262, 263. [* * *] Hornblower will have [* * *] This brings the total to [* * *], sufficient to handle the vast majority of trips (up to 499 passengers). Hornblower anticipates that the only time it will have 500 or more passengers on board a vessel simultaneously will be at the end of the day, when Hornblower will also be bringing back its staff from the island. [* * *] these final trips back to the mainland, bringing the total to [* * *] in the evening.

Plaintiff objects to these explanations as "an untimely attempt by [Hornblower] to supplement its proposal." Pl.'s Br. filed Jan. 31, 2006, at 23. The court does not agree. Hornblower is not attempting to supplement its proposal; rather, it is responding to allegations by plaintiff that it omitted from its costs [* * *] personnel who should have had the position and salaries of "deckhands." Hornblower explains that these [* * *] separate "deckhand" listings do not appear on the balance sheet because listing them would be duplicative in that they already are costed as [* * *]. The court does not see why Hornblower should be required to create duplicative entries in its balance sheets, and plaintiff has cited to no requirement that employees-wearing-two-hats should somehow be costed differently. The panel's failure to explore the assumptions regarding Hornblower's deck hands does not manifest an irrational basis for its determination that the proposal was financially viable.

Plaintiff also alleges that Hornblower omitted the expenses for the [* * *] "Island Staff" it proposed. Adding these personnel to the ledger adds [* * *] per year in costs.

Hornblower responds, first, that plaintiff is once again mistaken. [* * *] and therefore already included in Hornblower's costs. The other [* * *] were not included because Hornblower has proposed to [* * *]. Their costs, if any, would not be included in Hornblower's costs. However, even if Hornblower were to add the other [* * *] to its payroll, that would add only [* * *] per year, which is, by Hornblower's calculations, less than [* * *] of total annual expenses. This would easily be absorbed by [* * *] Defendant also adds its support, touting Hornblower's [* * *] Def.'s Br. filed Feb. 10, 2006, at 14, income statements as more than sufficient rational basis on their own for the panel to make a decision under this factor.

The court finds that Hornblower's financial statements provide a rational basis for the panel to conclude that Hornblower's proposal was financially viable. In addition, the [* * *] Island Staff who supposedly are missing are only missing from Hornblower's balance sheets because [* * *]. Their absence, and the panel's failure to comment

---

21. The court perceives that plaintiff's confusion originated in Hornblower's [* * *] AR 650.

thereon, does not mean that the panel lacked a rational basis when it decided the proposal was financially viable.

Because plaintiff's complaints regarding Hornblower's overstatement of revenue and understatement of costs are without merit, plaintiff's concerns for the franchise fee presented in Principal Selection Factor 5 are also unfounded.

### 5. *Misevaluation of secondary selection factors*

#### 1) *Misevaluation of Secondary Selection Factor 1*

Secondary Selection Factor 1 deals with "[t]he quality of the Offeror's proposal to conduct its operations in a manner that furthers the protection, conservation and preservation of the park area and other resources through environmental management programs and activities, including, without limitation, energy conservation, waste reduction, and recycling." AR 7576. In particular, the subfactors included:

*Subfactor 1(a)—Protection of Water Quality*

Please describe any best practices that are not expressly described in the draft contract . . . that you intend to implement to further protect water quality and minimize contamination by your operations. Your answer should address: The removal of sewage[; and] [t]he supply of drinking water to Alcatraz Island.

*Subfactor 1(b)—Water, Energy, and Resource Conservation*

Outline specific plans and programs that you intend to implement to encourage conservation of natural resources. Your answer should address: Green procurement . . . .[; and] [r]ecycling of solid waste.

AR 7621. Plaintiff contends that Hornblower provided almost no details on how it proposed to remove sewage from Alcatraz Island or provide potable water to the island. Therefore, the panel was without rational basis in giving Hornblower [* * *]-on this secondary selection factor.

Hornblower responds that it provided less detail than other offerors with regard to how it would transport potable water to the island

because its solution was more elegant. Instead of attempting to drag large tanks of potable water to the island, as plaintiff proposed, Hornblower would [* * *]. Moreover, Hornblower's proposal did provide details regarding its transportation of sewage, stating that

[* * *]

[* * *]

[* * *]

[* * *]

[* * *]

[* * *]

AR 674.

The panel cited to the above language of Hornblower's proposal, as well as its [* * *], when making its decision. AR 8544. The panel stated that

[* * *]

AR 8545, 8542. In addition, under Subfactor B, the panel stated that Hornblower

[* * *]

AR 8532. The panel also noted that Hornblower

[* * *]

AR 8528.

[* * *]

[* * *]

#### 2) *Misevaluation of Secondary Selection Factor 2*

Secondary Selection Factor 2 requires "[t]he offeror [to] demonstrate[ ] its commitment to utilize state of the art technology(ies) and/or alternative fuel sources in its vessel operations to reduce emissions beyond those required for compliance." AR 7622. The panel lacked a rational basis for its evaluation of this factor, according to plaintiff, because the [* * *] were technically unfeasible and practically unworkable. This is, however, merely a restatement of plaintiff's earlier position. The panel had a rational basis for its accreditation of these two vessels, as discussed above.

### 6. The lawfulness of the selection process: Applicability of the Service Contract Act

■ If the Park Service violated applicable procurement laws and regulations during its evaluation of the proposals, then the Park Service's selection might run afoul of the statutory standard, 5 U.S.C. § 706(2)(A), even if it was perfectly rational. *See Bannum*, 404 F.3d at 1351. An agency has no discretion regarding whether or not to follow applicable laws and regulations. It is irrelevant whether the agency views the regulation or requirement of the solicitation as important; is strictly bound by its terms "'regardless of the [agency]'s view of the appropriateness of the standard....'" *Alfa Laval Separation*, 175 F.3d at 1367–68 (quoting *Alfa Laval Separation*, 40 Fed.Cl. at 230). If the Park Service acted contrary to law, then the court must determine whether it was prejudicial to the plaintiff.

■ Plaintiff argues that the Park Service "unreasonably failed to recognize that the Service Contract Act, 41 U.S.C. §§ 351 et seq., applies to" the wages paid in the contract. Pl.'s Br. filed Jan. 3, 2006, at 2. The Service Contract Act applies to "[e]very contract (and bid specification therefore) entered into by the United States or the District of Columbia in excess of $2,500, except as provided in Section 7 of this Act, the principal purpose of which is to furnish services in the United States through the use of service employees ...." 41 U.S.C. § 351. The Act requires contractors to pay their employees "in accordance with prevailing rates for such employees in the locality" as determined by the Department of Labor, or "where a collective bargaining agreement covers such service employees, in accordance with the rates ... provided for in [that] agreement." *Id.* § 351(a)(1). Because the panel did not require Hornblower to submit wages computed in accordance with this Act, plaintiff contends Hornblower's labor costs were unreasonably low.

Defendant counters that the Service Contract Act does not apply to Park Service concession contracts. The Secretary of Labor, pursuant to the authority granted him by statute, has issued regulations "allowing reasonable variations, tolerances, and exemptions to and from any provisions of" the Service Contract Act. 41 U.S.C. § 353(b). This regulatory exception provides:

(b) The Department of Labor, pursuant to section 4(b) of the Act, exempt from the provisions of the Act certain kinds of concession contracts providing services to the general public, as provided herein. Specifically, concession contracts (such as those entered into by the National Park Service) principally for the furnishing of food, lodging, automobile fuel, souvenirs, newspaper stands, and recreational equipment to the general public, as distinguished from the United States Government or its personnel, are exempt. This exemption is necessary and proper in the public interest and is in accord with the remedial purpose of the Act. Where concession contracts, however, include substantial requirements for services other than those stated, those services are not exempt.

29 C.F.R. § 4.133(b) (2004). Moreover, the Park Service promulgated a regulation to the effect that, "[c]oncession contracts are not ... service or procurement contracts within the meaning of statutes, regulations or policies that apply only to federal service contracts or other types of federal procurement actions...." 36 C.F.R. § 51.3 (2004).

Plaintiff and amici curiae respond that the provision of ferry services does not fall into any of the categories of exemption passed by the Department of Labor, no matter what the Park Service might have declared by regulation. The International Organization of Masters, Mates & Pilots, ILA, contends that a 2004 letter from the Wage and Hour Division of the Department of Labor, relating to an analogous Park Service contract, shows that the Department of Labor probably would not allow exceptions in the instant case to the requirements of section 351. *See* Alfred B. Robinson, Jr., Dept. of Labor, Opinion Letter Re: Fair Labor Standards Act, July 13, 2004.

Both defendant and Hornblower also argue that plaintiff protests too late. The Proposal Instructions required plaintiff to submit to the Park Service, in writing and prior to the due date of the proposals, any clarifications

or suspected inaccuracies in the prospectus. AR 7575–76, 7578. The Park Service has a longstanding policy, codified by regulation, of not applying the prevailing wage provisions of the Service Contract Act to its concession contracts. *See* 36 C.F.R. § 51.3. Plaintiff knew of this policy for at least three reasons. First, plaintiff's existing concession contract with the Park Service does not contain a wage determination pursuant to the Service Contract Act.[22] *See* AR 6983–7138. Second, the Park Service included in the prospectus a copy of its regulations, among which was 36 C.F.R. § 51.3. Finally, regulations require that any prospectus applying the Service Contract Act include the applicable, currently effective wage determination specifying the minimum wages and fringe benefit for service employees to be employed under the contract. *See* 29 C.F.R. § 4.55(c) (2004). The prospectus issued by the Park Service did not include such information, signifying that the Park Service was not applying the Act. Despite its awareness that the Park Service was not applying the Service Contract Act to the proposals, plaintiff waited until after Hornblower's proposal was selected to protest.

The instant case is analogous to *Bannum, Inc. v. United States,* 60 Fed.Cl. 718 (2004), *rev'd and remanded on other grounds,* 126 Fed.Appx. 958 (Fed.Cir.2005) (unpubl.) Plaintiff in *Bannum* challenged the Bureau of Prisons's evaluation process of certain submitted forms. The trial court construed the challenge as not relating to the evaluation process, but to the terms of the solicitation. Although the court rejected the strict rules of the GAO, which "require that protests concerning the improprieties with solicitations be filed prior to bid openings," *id.* at 726, the court "embraced the utility of such procedures in the bid protest realm." *Id.* Such procedures "mandate that the bidder raise any problem within the solicitation before submission of the offer, or risk that the reviewing tribunal will regard the right to contest as waived." *Id.* Failure to protest to a problem with the solicitation "leaves the agency little option other than to follow the procedure mandated for competitive [bids] . . . ." *Id.* Doing otherwise would run afoul of Federal Acquisition Regulation § 15.305(a), which requires the agency to "evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." 48 C.F.R. (FAR) § 15.305(a) (2004). The court held that Bannum had "missed the proper time frame for protest." *Bannum,* 60 Fed.Cl. at 726.

While plaintiff declares that the panel was unreasonable by failing to apply the Service Contract Act, "upon closer examination, . . . [p]laintiff's complaint more resembles the challenge of a solicitation term than the challenge of the evaluation process." *Id.* The prospectus included detailed Proposal Instructions that directed any offerors to submit questions to the Park Service in writing if they believed there were "any [inaccurate] statement(s) in the Prospectus[,]" AR 7578, or if the offeror had any questions, AR 7575–76. Plaintiff did not ask the Park Service for clarification regarding the applicability of the Service Contract Act, despite the fact that it knew, or should have known, that the Park Service did not intend to apply the Service Contract Act to the proposals (for the reasons discussed above). Because no one questioned or protested the relevant terms of the prospectus, the Park Service lacked the opportunity to change them. For plaintiff to protest after submission of the proposals would hamstring the Park Service, as it is required by law to "evaluate . . . competitive proposals and make an award based solely on the factors specified in the solicitation[.]" 10 U.S.C. § 2305(b)(1) (2000).[23]

Plaintiff has missed its chance to protest when it did not challenge the terms of the solicitation. *See Bannum,* 60 Fed.Cl. at 726;

---

22. While plaintiff is not required to pay these wages by the terms of its contract, it pays them per its collective bargaining agreement with its employees' labor union.

23. Indeed, this is not a mere technicality. Hornblower represents to the court that, without the presence of a Service Contract Act wage determi-

nation in the prospectus-which would be required by law if the Park Service had been applying the Act to the proposals-Hornblower could not have "assess[ed] the appropriate wages and ma[de][its] necessary business calculations." Hornblower's Br. filed Feb. 10, 2006, at 19.

*see also Novell*, 46 Fed.Cl. at 615 (holding that "[o]fferors may challenge the terms of the solicitation, but only prior to submission of final proposals"). Plaintiff or Hornblower could have also submitted a wage determination to the Department of Labor, which is much more suited to interpreting its regulations in the first instance than the Court of Federal Claims. Because plaintiff did neither prior to the submission of the proposals, it is not allowed now to challenge the determination. The Park Service has a regulation on point, which states that their concession contracts are not subject to the Service Contract Act. While plaintiff disputes the Park Service's interpretation of the relevant laws and regulations, this is not the appropriate occasion or forum for that dispute.

### 7. *Prejudice to plaintiff*

If an agency's actions are determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[,]" 5 U.S.C. § 706(2)(A), the court proceeds "to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. However, in the instant case, none of the actions taken by the Park Service violated section 706. A prejudice analysis is therefore unnecessary.

### 8. *Plaintiff does not succeed on the merits*

■■■ Plaintiff fails to meet its burden of success on the merits because none of the Park Service's actions were arbitrary, capricious, or in violation of the law. *See* 5 U.S.C. § 706(2)(A). Therefore, plaintiff also fails this prong of the injunction test. *See PGBA, LLC*, 389 F.3d at 1228–29.

### III. *Other factors necessary for injunctive relief*

While success on the merits is the most important factor, "[n]o one factor, taken individually, is necessarily dispositive." *FMC Corp.*, 3 F.3d at 427. "[T]he absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial[.]" *Chrysler*, 908 F.2d at 953. Besides (1) success on the merits, injunctive relief requires plaintiff to demonstrate that (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest. *PGBA*, 389 F.3d at 1228–29; *FMC Corp.*, 3 F.3d at 427.

Plaintiff has shown irreparable harm. "An action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaving a bid protestor irreparably harmed." *Bannum*, 60 Fed.Cl. at 730 (quoting *Essex Electro Eng'rs, Inc. v. United States*, 3 Cl.Ct. 277, 287 (1983)). The financial harm to plaintiff is displaced by the harm to the Park Service and intervenors because of plaintiff's utter failure on the merits. Finally, plaintiff has not proven that the injunction is in the public interest. The Park Service made a rational decision that complied with all applicable regulations, and selected Hornblower as the contractor that, under the stated criterion set forth in the Prospectus, would benefit the Government and the public.[24]

### CONCLUSION

Based on the foregoing, defendant's and intervenor's cross-motions for judgment on the administrative record are granted, and plaintiff's motion for judgment on the administrative record is denied. Accordingly,

**IT IS ORDERED**, as follows:

1. The Clerk of the Court shall enter judgment for defendant and intervenor.

2. By March 17, 2006, the parties shall notify the court if this opinion should be issued for publication. If so, they shall identify in brackets any material subject to re-

---

**24.** An injunction based on the Service Contract Act would not be in the public interest. As Hornblower points out, even if subsequent decisions by the Department of Labor interpret the applicable regulations to require higher wages, the Department of Labor can apply them retroactively to the existing Park Service contract. *See* 29 C.F.R. § 4.5(c).

daction before this opinion issues is published.